GENERAL MOTORS CORPORATION *v.* WILLIAM MULQUIN
ET AL.

MALTBIE, C. J., BROWN, ELLS, DICKENSON AND O'SULLIVAN, JS.

Argued April 10—decided October 29, 1947

*William A. Grier* of the New York bar, with whom were *Charles P. Markey* of the New York bar, *Thomas J. O'Donnell* and, on the brief, *William J. Malone,* for the appellant (plaintiff).

*David R. Lessler,* with whom was *Millard Kaufman,* for the appellees (defendants).

*Paul W. McMahon* filed a brief for certain of the appellees (defendants).

O'SULLIVAN, J. The legal questions submitted by this reservation arise from the following facts found by a panel of three unemployment commissioners sitting on the plaintiff's appeal from the examiner's decision.

The New Departure Division of General Motors Corporation consists of two industrial plants in Connecticut, one at Bristol and the other, about eighteen miles away, at Meriden. Speaking generally, the Division—for so it will be called—is engaged in the production of ball bearings of various sizes. The bearings are antifriction devices consisting of steel balls, cones, cups and separators. All of these items, with the exception of the last, are manufactured at Bristol. The Meriden plant, which

is equipped to manufacture only the separators, receives from Bristol the other necessary parts and, after continuing certain processes initiated on them at the sister plant, assembles bearings of the smaller sizes.

There is one general manager for the entire Division. With his assistants, such as the Division comptroller, general purchasing agent, general sales manager and the like, he maintains his office at Bristol. This executive staff supervises both plants, although each has its own superintendent and, under him, various departmental heads. While the general purchasing agent has charge of all Divisional purchases, an official at Meriden has, under certain limitations, the authority to buy miscellaneous supplies for that plant. The purchases effected through the local office approximate 10 per cent of the total material bought for the Meriden plant.

The financial affairs of the Division are in the hands of the Division comptroller at Bristol. Each plant, nevertheless, maintains at a local bank a separate account upon which it draws for the payment, among other things, of the wages due certain of its employees. Checks so drawn are signed by an officer of the plant issuing them. In the records of the unemployment compensation department at Hartford, General Motors Corporation carries two accounts, one for the Bristol and the other for the Meriden plant, and the tax payable into each account is determined by the compensable separations chargeable against the experience of each plant respectively.

At all times pertinent to this case, the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, Congress of Industrial Organizations, hereinafter designated as the International, was, with certain immaterial ex-

ceptions, the certified and exclusive representative, for the purpose of collective bargaining, of all production, maintenance and mechanical employees at many General Motors plants, including the one at Bristol. On April 16, 1945, the International and General Motors Corporation executed a contract applicable to all of the latter's plants throughout the United States at which the former was the certified representative. Paragraphs of the contract which have a bearing on the issues are incorporated in a footnote.[1]

---

[1] (1) The Corporation recognizes the International Union, United Automobile, Aircraft and Agricultural Implement Workers of America, affiliated with the CIO, as the exclusive representative of the production and maintenance employes and mechanical employes in engineering department shops, except those listed in Paragraph (3) below, for the purpose of collective bargaining with respect to rates of pay, wages, hours of employment, or other conditions of employment in the bargaining units in which they have been so certified, subject to and in accordance with the provisions of the National Labor Relations Act and applicable orders of the National Labor Relations Board.

(2) In case the UAWA-CIO shall be certified as the bargaining representatives for any additional bargaining units, the matter of including such unit under the terms of this Agreement shall be negotiated between the Personnel Staff of the Corporation and the International Officers of the Union; it being understood that plants producing cars, trucks, bodies or automotive parts similar to the material now being produced by plants covered by this Agreement, shall be included after giving due consideration to any local wage classifications, rates, understandings or practices as may exist.

(2a) Separate agreements will be negotiated for bargaining units not falling into the above classifications.

(3) For the purposes of this Agreement the term "employe" shall include all production and maintenance employes and mechanical employes in engineering department shops in the bargaining units covered hereby. . . .

* * * * *

(131) The Union has requested this National Agreement in place of independent agreements for each bargaining unit covered hereby. Accordingly an authorized strike in one bargaining unit under this Agreement which results in an interruption of the flow of material

Prior to September 24, 1945, the bargaining agent at the Meriden plant had been affiliated with the American Federation of Labor, but, following an election held on that date, the International was selected and on October 8 was certified by the National Labor Relations Board as the exclusive bargaining representative of that class of employees, to which all of the approximately 2100 defendants belong. On October 26, 1945, General Motors Corporation and the International executed a memorandum of agreement with reference to the employees at the Meriden plant. This instrument provided that for collective bargaining purposes the parties should be governed by all of the provisions of their contract of April 16, 1945, with certain exceptions not here material. It also provided that a shop committee to be chosen by the members of the local CIO should subsequently negotiate with officials of the Division on the question of wages and other matters in behalf of and subject to the approval of the International. Certain excepted matters were to be negotiated directly by the International before the Meriden plant came under the full terms of the April contract.

In the meantime, on October 24, 1945, a strike vote had been taken, pursuant to the Smith-Connally Anti-Strike Act, in all of the company's plants, except that at Meriden, at which the International was the bargaining agent, and, as the result of the vote, a strike began on November 21. No such vote was ever taken at the Meriden plant, which continued to operate, but with increasing inefficiency, during the entire time covered by the remainder of this

or services to operations in any other bargaining unit under this agreement, will be considered an authorized strike in any such affected bargaining unit.

narrative. No picket line was established there and the employees continued to report for work. About two weeks before the commencement of the strike, the International granted a charter to its membership at the Meriden plant, and shortly thereafter the president of that local and a representative of the International addressed a letter to the Division making demand for a 30 per cent increase in the schedule of wages. Shortly before Christmas the local urged its members to accord financial assistance to the strikers elsewhere upon the ground that the Meriden employees would benefit from the strike. Collection boxes were placed in various Meriden stores and $108 contributed through this means was sent to an official of the Bristol local.

With the closing of the plant on November 21, all production ceased at Bristol, and the Meriden plant was thereafter unable to obtain steel balls and other parts from that source. However, for the ten days following the calling of the strike the plant maintained its full complement of employees at work. Then, because of its diminishing stock piles and its inability to replenish them in the general market, as the purchasing department attempted to do, it became necessary gradually to reduce the number of its employees. Eventually, about 2100 received their notices of separation. Each of these employees was laid off as a direct result of the shortage of parts essential to the assembling of bearings, and this shortage was attributable to the strike at the Bristol plant. It was not until March 13, 1946, that a settlement was reached between General Motors Corporation and the International, and shortly thereafter the strike at all plants ended.

The settlement reinstated the contract of April 16, 1945, which General Motors Corporation, in accord-

ance with one of the contractual provisions, had terminated on December 10, 1945. The parties agreed upon maintenance of membership and checkoff systems, seniority rights, overtime pay, incentive plans, a flat wage increase of eighteen and one-half cents an hour, with certain retroactive features, and vacation pay. All of the benefits of the settlement are applicable to the employees at Meriden.

As each defendant became separated, he filed a claim for unemployment benefits. From the action of the examiner in allowing these claims the plaintiff appealed to the unemployment commissioner, who, with two of his associates called to sit on the matter, affirmed the examiner's decision. A subsequent appeal to the Superior Court resulted in this reservation, which submits for our consideration two questions:

1. Did the commissioners err in holding that the defendants are not ineligible to receive unemployment benefits?

2. Did the commissioners err in holding that § 131 of the agreement of April 16, 1945, between General Motors Corporation and the International is void as contrary to and prohibited by § 1346e (a) of the 1939 Cumulative Supplement?

The defendants would concededly be entitled to the financial benefits under the act, were it not for § 1339e (b) (3) of the 1939 Cumulative Supplement to the General Statutes. Except for a clause which has no present relevancy, this section provides that an employee shall be ineligible for benefits during any week in which his total or partial unemployment is due to the existence of a labor dispute at the "factory, establishment or other premises" at which he is or has been employed. The core of the plaintiff's argument, as it deals with the first propounded

question, is that the defendants cannot be classified as beneficiaries because they fall within the disqualifying provisions of the act in that they were employed at the Meriden plant, which, with the one at Bristol, it is claimed, formed a single establishment.

The weakness of this rather plausible argument lies in the undue emphasis placed upon and the erroneous interpretation given to the word "establishment" in the quoted phrase. The legislature, it must be noted, specified not one but three classifications, within which fall all places where those to whom the provisions of the act were meant to apply are employed. With the classification created by the expression "other premises," we need not be concerned. It is not involved in this case and, furthermore, in accordance with the rule of ejusdem generis, its significance hinges in large measure upon the meaning ascribed to the words which precede it. *Grissell* v. *Housatonic R. Co.,* 54 Conn. 447, 467, 9 A. 137; *Griffin* v. *Fancher,* 127 Conn. 686, 690, 20 A. 2d 95.

That the legislative objective was to differentiate between factories, on the one hand, and establishments, on the other, seems to us to be obvious. Under the simplest definition and common-sense understanding, an establishment—the word which the plaintiff insists on stressing—is merely something established. *Chrysler Corporation* v. *Smith,* 297 Mich. 438, 448, 298 N. W. 87. In this broad sense, the word embraces such things, among countless others, as garages, laundries and department stores, and, we add, it takes in factories as well. If this be the sense in which it was used, we would be compelled to impute to the legislature the needless step of incorporating in the phrase a meaningless word, because every factory would be an establishment.

This we cannot do. No word in a statute should be treated as superfluous, void or insignificant unless there are impelling reasons, not here discernible, why this principle cannot be followed. *Fenwick* v. *Old Saybrook*, 133 Conn. 22, 28, 47 A. 2d 849; *Niedzwicki* v. *Pequonnock Foundry*, 133 Conn. 78, 82, 48 A. 2d 369.

The phrase "factory, establishment or other premises" takes color, not from "establishment," as the plaintiff would have it, but rather from the word "factory." In common parlance the latter ordinarily means a single industrial plant. No one, for instance, would speak of the many units of General Motors Corporation, scattered as they are throughout several states, as a factory. In its customary acceptation, a factory is a building or group of buildings used in connection with each other for the common purpose of manufacturing articles, usually, but not necessarily, in the same inclosure or same immediate neighborhood. *Liebenstein* v. *Baltic Fire Ins. Co.*, 45 Ill. 301, 303. It is "the place where workmen are employed in fabricating goods, wares, or utensils." Webster's New International Dictionary (2d Ed.).

The social evil, however, which this type of legislation was designed to ameliorate is not confined to factorial origin. It occurs in banks, theaters, hotels and the vast mercantile trades, not one of which, quite manifestly, falls within the classification of a factory. By embodying in the phrase the word "establishment," the legislative intent was to broaden the field of operation and extend the beneficence of the act to those employed in places other than factories, excepting of course, those whom the act expressly excludes. General Statutes, Cum. Sup. 1939, §§ 1334e, 1335e; see also Report of Governor's

Commission on Unemployment Compensation (Nov. 1936), pp. 108–116, 122.[1] We conclude, then, that the word "establishment" is not to be given the sweeping definition of which it is capable but rather is to be construed in the qualified and restricted sense of being a business or industry other than one conducted in a factory. The plants at Bristol and Meriden fall within the "factory" classification, and not within that of "establishment."

This brings us to a crucial query: Is each of the

[1] This report, prepared by a commission appointed by Governor Cross and available to the legislature, submitted the following classification of industries:

MANUFACTURING
  Textiles
  Foundries & Machine Shops
  Brass, Bronze & Copper
  Iron & Steel Products
  Electric Machinery
  Hats, Caps & Corsets
  Typewriters, Ammunition & Firearms
  Silver & Plated Ware
  Rubber Products
  Clocks & Watches
  Other Manufacturing

CONSTRUCTION
  Heavy Construction
  Light Construction

MERCANTILE TRADE
  Wholesale Trade
  Retail Trade
  Automotive Sales & Service
  Miscellaneous Trade

OTHER TRADE
  Banks & Trust Companies
  Insurance Companies
  Brokerage Houses
  Real Estate
  Other Financial Service

PUBLIC UTILITIES
  Steamship & Air Lines
  Electric & Steam Railroads
  Bus Lines, Trucking & Taxicabs
  Communications
  Power, Light, Water & Gas

PERSONAL SERVICE
  Hotels
  Restaurants & Inns
  Laundries, Dyeing, Cleaning
  Beauty Parlors, Barber Shops
  Recreation
  Miscellaneous Service
  Other Domestic Service

COMPENSABLE AGRICULTURE
  Tobacco
  Animal Breeding
  Florists & Nurserymen
  Oyster Growers
  Forestry

PRIVATE INSTITUTIONS
  Private Institutions
  Social Organizations
  Other Services

EXTRACTIVE INDUSTRIES
PROFESSIONAL SERVICES

plants at Meriden and Bristol a separate factory or do both form one? That the word "factory," as used by the legislature, was meant to refer to a single industrial plant is supported not only by the application of what, in common parlance, a factory is deemed to consist but also by the history of the act, a legitimate source of potential help in resolving doubt as to the legislative intent. *Kelly* v. *Dewey,* 111 Conn. 281, 287, 149 A. 840; *Schmidt* v. *O. K. Baking Co.,* 90 Conn. 217, 223, 96 A. 963; *Corbin* v. *Baldwin,* 92 Conn. 99, 105, 101 A. 834.

Our act is based upon a draft proposed by the federal social security board for adoption by the states. Social Security Board, Draft Bills for State Unemployment Compensation of Pooled Fund and Employer Reserve Account Types (1936). This draft was patterned in part after the British National Insurance Act of 1911 (1 & 2 Geo. V, c. 55, pt. 2) as amended. Section 87 of that act disqualifies from benefits any workman who has become unemployed by reason of a stoppage of work due to a trade dispute at the "factory, workshop, or other premises" at which he is employed. The section then concludes as follows: "Where separate branches of work which are commonly carried on as separate businesses in separate premises are in any case carried on in separate departments on the same premises, each of those departments shall, for the purposes of this provision, be deemed to be a separate factory or workshop or separate premises, as the case may be."

The draft submitted by the federal board adopted that part of § 87 just quoted, with minor changes in phraseology. Although this part was omitted from our act, the vital point is that in both the British act and the federal draft the words "factory," "workshop," and "establishment" refer quite definitely to

single units. Such have been the consistent rulings of the umpire, the highest authority under the British act. See cases No. 356 (1921), 6776 (1923), 1807 (1926), 4943 (1926), reported in Ben. Ser. (Gen. Sup. 1) BU–573, BU–590, BU–574, BU–572. A like meaning should, therefore, be given to the words in the phrase under discussion.

In urging a construction contrary to that which we have reached, counsel have cited certain cases, notably *Unemployment Commission* v. *Aragon,* 329 U. S. 143, 67 S. Ct. 245, 91 L. Ed. 143; *Spielmann* v. *Industrial Commission,* 236 Wis. 240, 295 N. W. 1; *Chrysler Corporation* v. *Smith,* 297 Mich. 438, 298 N. W. 87. To these we add *Matson Terminals, Inc.* v. *California Employment Commission,* 24 Cal. 2d 695, 151 P. 2d 202. The first mentioned involved the Alaska act, whose disqualifying provision is identical with our own. Alaska Sess. Laws (Extraordinary Sess.) 1937, c. 4, § 5(d). The analogous counterpart in the acts of Wisconsin, Michigan and California differs from ours in that the words "factory" and "other premises" do not appear and disqualification in those states occurs when unemployment is due to a labor dispute "in the establishment" where the claimant worked. See Wis. Stat. (Brossard, 1945) § 108.04(10); Mich. Comp. Laws (Mason, Cum. Sup. 1940) § 8485–69(d); Cal. Gen. Laws (Deering, 1944) Act 8780d, § 56(a). In each instance, the state courts, whose decisions we have cited, extended to the word "establishment" the sweeping definition to which reference has previously been made. Because of the difference in terminology between their acts and ours, these state decisions are distinguishable, we believe, while in the federal case the court was not dealing with such a question as the one before us, inasmuch as "The

scope of the hearings was confined to the issue of whether the unemployment of the claimants was caused by the existence of a labor dispute." *Unemployment Commission* v. *Aragon*, supra, 148. Certain dicta found in the federal opinion we cannot follow, and if the reasoning in the three state decisions appears at odds with that expressed herein we cannot approve it.[1]

It is a matter of prime importance, then, to determine whether the plant at Meriden is a separate factory, because, unless it be such, the statutory provision of ineligibility will preclude the defendants from unemployment benefits. The solution is not to be found merely in its physical isolation from Bristol, a circumstance which, as their memorandum indicates, the commissioners deemed decisive. Geographical separation is important but is by no means controlling. Where, as here, a manufacturing corporation carries on its business in buildings at different localities, the test is whether they are so operated as to constitute a single unit; if so, they amount to a single factory. The application of this test requires a consideration of many factors, such as the scheme of management, supervision and production of each plant; that is, whether or not those locally in immediate charge, let us say, of the one plant, are subject to the authority of those operating the other, as distinguished from their being under

---

[1] At the recent General Assembly, the disqualifying provision of the act was amended so as to make any unemployed person ineligible for benefits "during any week in which it shall be found by the administrator that his total or partial unemployment is due to the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, *or at a factory, establishment or other premises operated by his employer in the state of Connecticut.*" Sup. 1947, § 1391i. The italicized words represent the change.

the control of policy-framing officials ranking higher in the pyramid of the corporate structure. Consideration should likewise be given to the source of authority in hiring, paying and discharging employees, to the methods of making purchases and sales, to the manner of handling accounts, and to all other relevant and kindred matters, not excluding such a plan as that adopted by the plaintiff of carrying with the unemployment compensation department of the state individual plant accounts into which are paid taxes, under the act, in proportion to the respective, compensable separations of each plant.

Inasmuch as the commissioners applied an improper standard, the first question propounded by the reservation must be answered in the affirmative. *Burk* v. *Corrado,* 116 Conn. 511, 165 A. 682. Whether the Meriden plant is a single unit is for the fact-finding body to determine. "It is not the proper function of this court to adjudicate such an issue." *New Haven Metal & Heating Supply Co.* v. *Danaher,* 128 Conn. 213, 217, 21 A. 2d 383. The matter must, therefore, be returned to the commissioners.

Parenthetically, at this point, we may dispose of a further claim which runs to the effect that, even though the plant at Meriden is a separate factory, the wage demands made there created a labor dispute. No definition of a "labor dispute" is incorporated in the act. Nor is it necessary to formulate one, because, even assuming that such a dispute existed at Meriden, the commissioners have found that it was not the cause of the unemployment.

The commissioners further decided that § 131 of the agreement of April 16, 1945, is void so far as the claims for unemployment benefits are concerned because it violated the provisions of § 1346c of the

Cumulative Supplement of 1939. These provisions read that "No agreement by an employee to waive, release or commute his rights to benefits or any other rights under this chapter shall be valid. . . . No employer shall, directly or indirectly, make or require or accept any . . . waiver by an employee of any right hereunder."

Passing by the legal effect of the action of General Motors Corporation in terminating on December 10, 1945, its contract with the International, we are met with a statement of public policy, expressed in the act, as to the lessening or destroying, by agreement, of an employee's right to benefits. Primarily, it is for the legislature, which is the arbiter of public policy, to determine what it shall be. *Lyman* v. *Adorno,* 133 Conn. 511, 514, 52 A. 2d 702; *State* v. *Gilletto,* 98 Conn. 702, 714, 120 A. 567. And a constitutional statute can never, by judicial decree, be declared to be against such policy. The cases on which the plaintiff relies are not in point. They are concerned with questions of alleged public policy which is not grounded on statute. *Printing Co.* v. *Sampson,* L. R. 19 Eq. 462; *Twin City Co.* v. *Harding Glass Co.,* 283 U. S. 353, 357, 51 S. Ct. 476, 75 L. Ed. 1112.

The second reserved question goes further in its quest than is warranted by the trier's ruling. It is so framed as to seek an answer stating whether § 131 is void for all purposes. The commissioners reached no such conclusion and, obviously, the question is broader than is justified. Indeed, we are not able upon this record even to determine whether the application of § 131 to claims for unemployment benefits was in the contemplation of the parties when the agreement was executed; but, if it was, to that extent at least § 131 is void and ineffective.

"Questions in a reservation should be so stated

that each will present a definite point of law and that the court may give to each a categorical or very definite answer." *Ericson* v. *Childs,* 124 Conn. 66, 82, 198 A. 176. Those propounded in this case, asking whether the commissioners erred in holding that the defendants were not ineligible to receive unemployment benefits and that § 131 of the agreement was void, are not proper. Because, however, of the importance of the issues involved and the fact that the claims of the parties have been fully presented in argument and brief, we have overlooked that defect.

Our specific answer to the first question is "Yes." As to the second, our answer is that, if it was within the contemplation of the parties that § 131 of their agreement would prevent the award of unemployment benefits to the employees, the section is, to that extent at least, void and ineffective.

No costs will be taxed in this court to any party.

In this opinion MALTBIE, C. J., and DICKENSON, J., concurred; BROWN and ELLS, Js., concurred in the result as specifically expressed by the answers to the two questions propounded.