WALTER H. LANYON ET AL. *v.* ADMINISTRATOR, UNEMPLOYMENT COMPENSATION ACT, ET AL.

BROWN, C. J., JENNINGS, INGLIS, O'SULLIVAN and BORDON, Js.

Argued April 1—decided May 27, 1952.

*Maurice J. Buckley,* with whom were *Joseph T. McCue, Jr.,* and, on the brief, *Matthew E. Hanna,* for the appellants-appellees (plaintiffs).

*Joseph L. Melvin,* for the appellant-appellee (defendant The Yale & Towne Manufacturing Company).

O'SULLIVAN, J. The plaintiffs are 395 in number. On November 7, 1945, they were in the employ of The Yale & Towne Manufacturing Company, hereinafter called the company. Subsequent to that date, they applied for relief under the Unemployment Compensation Act. A panel of three commissioners, sustaining the administrator's ruling, awarded them benefits for twenty-two weeks. On the company's appeal from that decision, the Superior Court reduced the compensable weeks to four. Both the company and the plaintiffs have appealed from the judgment rendered by the court. The ultimate grievance of the plaintiffs is directed to the action of the court in eliminating from the panel's award benefits for eighteen weeks, while that of the company is addressed to the court's refusal to deny benefits altogether.

The panel found the following facts: The company, a manufacturer located at Stamford, is an employer subject to the provisions of the Unemployment Compensation Act. Since 1944, those of its employees who are engaged in production have been represented in collective bargaining by three union locals. The plaintiffs are white collar workers attached to the office force. They have been affiliated with a union covering their own craft and, in their dealings with the company, have been represented by Local 90.

On the morning of November 7, 1945, all of the production workers, numbering about 2600, went out on strike. After first parading around the plant, they established picket lines at the factory gates. At the one ordinarily used by the plaintiffs, approximately 400 strikers gathered in mob formation, shouting threats at those remaining inside. At noontime, the president of Local 90 suggested to the office force that it would be unwise to go out for lunch since it was doubtful if any who did so would be able to get back. Some who ignored his advice and left did not return. During the afternoon, the company's president found it impossible, even with police assistance, to get into the plant. Late in the afternoon, members of the office force were told that they would be allowed to cross the picket line to go home. While passing through the mob, they were informed by the pickets that it was their last day of work. They returned, nevertheless, on the following morning to find large crowds congregated in the nearby streets and mass picketing still in effect at the gates. They made no effort to enter on that day because of fear of bodily harm from the pickets. On November 8 and 9, the pickets refused to let anyone other than the general manager enter the plant. On

the next day, three employees, including the president of Local 90, were permitted to go into the factory. Beginning on November 12 and for some days thereafter, about seventy of the management personnel were allowed to pass through the gates.

When the strike began, the local chief of police dispatched detectives and patrolmen to the scene and ordered all of them to return to police headquarters after completing their tour of duty at the plant and to remain there in reserve for the balance of the day. This arrangement was maintained throughout the four months' duration of the strike. The situation had become so tense by November 14 that as a precautionary measure the police brought tear gas and guns into the plant. Fear of resort to force continued throughout the balance of November. During that time, no one was allowed to enter except the management personnel mentioned above. On December 3, the situation appreciably worsened. From then until December 7, the plant was practically in a state of siege. No one but the general manager could get in or out. To provide for those forced to remain inside, food was passed over a back fence at night. Because of the type of picketing existing from November 7 to December 7 and the triggered tenseness which characterized conditions during that time, it would have been dangerous for any employee who did not have permission from the strikers to attempt to cross the picket line. Though none of the plaintiffs had such permission, some of them, whom the panel failed to single out by name, did approach the gate, but the attitude of those on the line caused them to turn away.

The strike had by now become a matter of state and national interest. On December 6 the governor decided to intervene. As a result, state police offi-

cers were sent on the following morning to augment the local police force. Mass picketing was immediately broken up and, except on the occasions mentioned below, remained discontinued until the strike ended on April 8, 1946.

On December 10, the company wrote to 122 of its clerical employees, urging them to report for work. Fifty-three did return although there had been no lessening of the strikers' hostility towards those crossing what had by now become a token picket line. Later on, during the first three months of 1946, thirty-nine other clerical employees went back to their jobs.

With the elimination of daily mass picketing, trouble developed in other forms. Vandalism became one of the chief weapons of terror. Between December 7 and 26, this manifested itself in a variety of ways. For example, factory windows were broken at night, a transformer was damaged, apparently by a bullet, a carload of coal was dumped on a company railroad siding, and tacks and nails were strewn around the factory parking lot.

On December 27, mass picketing was re-established in an atmosphere of explosive excitement. The detachment of state police, which had been gradually reduced to one or two officers, was increased to its former complement, and practically the entire Stamford force were detailed to the plant. Attempts by the police to get some employees through the picket line were completely unsuccessful. These conditions prevailed for the next five days.

Vandalism continued unabated throughout January, February and March. On two days in March, mass picketing was again resumed. Approximately 150 state and local police officers were assigned to handle the riotous situation which ensued. Some of

the officers were injured, others were stripped of their guns and shields. Twenty-two arrests were made on these two days.

Prior to the commencement of the strike, the office workers, through Local 90, had been negotiating with the company for modification of their contract. They were insisting upon a 30 per cent increase in wages and a closed shop, and the company had not agreed to these terms. When the strike ended, the company granted them an increase in wages of 12.5 cents an hour. Although each plaintiff may have felt, because of his union affiliation, that he should not cross the picket line, he also entertained a very distinct and reasonable fear that any effort to do so would jeopardize not only his own safety but also that of his family. The presence of this danger was brought home to him in many ways. It was noticeable from the attitude of the strikers, whether acting as pickets or otherwise, and from the insulting remarks made to those who did cross the line; it was observable in actual acts of violence of which the plaintiffs had firsthand knowledge; it was revealed in newspaper articles describing the riotous conditions which prevailed continuously during the first month of the strike and at various times thereafter; it was suggested in public statements made by management concerning the seriousness of the situation; and it was discernible in reports of sabotage to company property and in the treatment accorded management personnel. The company did not want any of its employees to try to cross the line if there was a probability that violence would occur. This probability was present from November 7, 1945, until April 8, 1946.

On the basis of the foregoing facts, the panel decided that the plaintiffs were entitled to unemploy-

ment benefits from November 7, 1945, when the strike began, until April 8, 1946, when it ended. On appeal, the Superior Court reduced the compensable weeks to four, concluding that they should be limited to those during which the original mass picketing made access to the factory physically impossible. The reason impelling this conclusion, as stated in the court's memorandum of decision, was that the plaintiffs were involuntarily unemployed from the beginning of the strike until December 7, 1945, but that from then on their voluntary refusal to cross the picket line made them participants in the labor dispute and hence ineligible for benefits..

On the appeals to this court, the corrections made to the panel's finding by the Superior Court at the behest of the company have been assigned as error by the plaintiffs, while the court's failure to make additional requested corrections has been assigned as error by the company. The court made twenty corrections to the finding, some of which are of no material significance. Speaking broadly, those which are vital covered two subjects. One was concerned with specific disciplinary action claimed to have been taken by the executive committee of Local 90 against several of its members who returned to work after December 7, 1945. The other dealt with the claimed activities of Jerome Y. Sturm, an attorney at law who prior to the strike had been bargaining with the company concerning new contracts not only for the production workers but for the office force as well and during the pendency of the strike had told members of the office force that he would obtain pay increases for them before the strike was settled, and who in fact had negotiated with representatives of the company upon that basis. The company's position before the court was that these additional facts

had a material bearing on the question whether the plaintiffs were participating in or had a direct interest in the strike, a question which, as will later appear, is decisive of the case.

The vigorous attack made by the plaintiffs on the action of the court compels us to restate its power to correct a finding. An unemployment commissioner is an administrative officer. See *Leszczymski* v. *Andrew Radel Oyster Co.*, 102 Conn. 511, 514, 129 A. 539. An appeal from his decision to the Superior Court is allowed by statute. General Statutes § 7521. The court does not try the matter de novo. It is not its function to adjudicate questions of fact. See *General Motors Corporation* v. *Mulquin*, 134 Conn. 118, 131, 55 A.2d 732; *New Haven Metal & Heating Supply Co.* v. *Danaher*, 128 Conn. 213, 217, 21 A.2d 383. Nor may it substitute its own conclusions for those of the commissioner. *Almada* v. *Administrator*, 137 Conn. 380, 391, 77 A.2d 765. It may go no further than to determine whether the commissioner acted unreasonably, arbitrarily or illegally. *Hoffman* v. *Kelly*, 138 Conn. 614, 617, 88 A.2d 382; *Beaverdale Memorial Park, Inc.* v. *Danaher*, 127 Conn. 175, 181, 15 A.2d 17. To be sure, the statute authorizes the court to correct the finding. General Statutes, Cum. Sup. 1951, § 1330b. That authority, however, may be exercised only to the extent provided by § 397 of the Practice Book.[1] This im-

---

[1] Section 397 was adopted as part of our procedure in appeals from trial courts to the Supreme Court of Errors. Words incorporated in brackets are substitutions inserted to clarify the application of the section to appeals from decisions of unemployment commissioners.

"Sec. 397. CORRECTIONS AS TO FACTS, WHEN MADE. Corrections of findings of fact will only be made:

"(a) Upon the refusal to find a material fact which was an admitted or undisputed fact. That a witness testified to a fact without

poses a limitation on the power to correct, and the court may not act beyond the limitation so set.

It often happens, as it did in the case at bar, that evidence as to certain claimed facts which are neither admitted nor undisputed is presented to the commissioner, who makes no finding thereon and who subsequently, by denying a motion to correct, refuses to add the requested facts to his finding. When under such circumstances the existence or nonexistence of a fact is material to the question of law which the proponent of the evidence desires to raise on appeal, the Superior Court is powerless, under the rule, to add the fact to the finding. In an analogous situation involving an appeal under the Workmen's Compensation Act, we pointed out the difference between the power of the commissioner to correct and that of the court on appeal. "[A] motion to correct the finding presented to the court cannot take the place of action by the commissioner, because it can add only admitted or undisputed facts while the commissioner should find the facts which he deems proven, though the evidence of them be conflicting." *Senzamici* v. *Waterbury Castings Co.,* 115 Conn. 446, 450, 161 A. 860.

The company contends, however, that the court was warranted in adding to the finding by virtue of specific authority granted by certain sections of the Practice Book. Section 322 provides that the procedure on appeals from the awards of unemployment commissioners shall be the same as that provided by

direct contradiction is not of itself sufficient; the [commissioner] must be the judge of the credit to be given to a witness.

"(b) Upon the finding of a fact in language of doubtful meaning so that its real significance may not clearly appear. Such correction will rarely be made and never for the mere purpose of substituting language of counsel for that of the [commissioner].

"(c) Upon the finding of a material fact without evidence."

the rules governing appeals from workmen's compensation commissioners. One of these rules refers to the function of the court. Practice Book § 312. The final sentence of that section recites that, "[w]hen it appears necessary to protect substantial rights of a party, the superior court may order a transcript of the evidence and make such findings therefrom . . . as it deems the law requires." As originally drafted, the rule was applicable only when it was "necessary to protect substantial rights of a party *not represented by counsel*" (italics supplied). Practice Book, 1922, p. 257, § 69. The language of the sentence appears to have been largely taken from an opinion of this court released in 1918, when the procedure on appeals from compensation awards was in a formulatory stage. *Rainey* v. *Tunnel Coal Co.*, 93 Conn. 90, 93, 105 A. 333; see *Atwood* v. *Connecticut Light & Power Co.*, 95 Conn. 669, 674, 112 A. 269. The italicized words were removed from the text by an amendment adopted June 2, 1930. Whatever may have prompted the adoption and retention of the rule, the fact remains that it has never been construed to extend the power of the court to make additions to the finding other than those which are admitted or undisputed. *Bailey* v. *Mitchell*, 113 Conn. 721, 724, 156 A. 856; *Palumbo* v. *George A. Fuller Co.*, 99 Conn. 353, 355, 122 A. 63. The court erred in adding to the finding facts which fell within neither of those categories. For this reason, the plaintiffs' appeal must be sustained. Proper procedure under the circumstances required a remand to the panel with instructions to find facts respecting the two subject matters referred to previously.

It is urged, however, that the panel has already passed upon these matters. The company's motion to correct contained fifty-eight paragraphs. Of these,

some sought to eliminate from the finding several facts claimed to have no support in the evidence, but most of them requested that certain unfound facts be added. Of the latter, five rather unimportant requests were granted. The panel denied the remainder, stating in its memorandum that the desired additions were immaterial and irrelevant. "To refuse to find the facts which a party seeks to have stated because the commissioner deems them . . . immaterial is not ordinarily fair to the parties . . . because they are entitled to have found such proven facts as they deem it necessary to present to the court upon the appeal. . . ." *Senzamici* v. *Waterbury Castings Co.*, 115 Conn. 446, 450, 161 A. 860. If Local 90 disciplined some of its members for crossing the picket line, and if Sturm, as the representative of that local, used the existence of the strike to procure a more advantageous settlement of his demands, those facts would clearly have a bearing on the question whether the plaintiffs were participating in and had a direct interest in the strike. Even though these facts may have been disputed, the company was entitled to a statement of what the panel's findings upon them were. In denying the company's motion to add them to the finding on the ground that they were immaterial, the panel did not indicate that the claimed facts had not been proved. Had such a reason been stated, a different situation would have been presented.

We now turn to the substantive law of the case. The legislative purpose in passing the Unemployment Compensation Act was to ameliorate the tragic consequences of unemployment. *Waterbury Savings Bank* v. *Danaher*, 128 Conn. 78, 82, 20 A.2d 455. In spite of this humanitarian objective, the General Assembly has made ineligible to receive benefits any

person who is out of work because of the existence of a labor dispute at the factory, establishment or other premises at which he is or has been employed, unless he is exempt from this disqualification as stated below. General Statutes, Sup. 1941, § 718f (as amended, Rev. 1949, § 7508). Ineligibility therefore is conditioned in the first place upon the occurrence of the labor dispute at specified places. *General Motors Corporation* v. *Mulquin,* 134 Conn. 118, 124, 55 A.2d 732. Furthermore, it can arise only if the dispute bears a causal relation to the unemployment. In the case at bar, we are not concerned with either of these contingencies. It is conceded that both existed.

After prescribing this disqualification, the act goes on to enumerate circumstances under which those falling within the disqualifying clause may escape its consequences. To state it specifically, the act in effect at the time of the strike exempted from disqualification all unemployed persons who (A) were not (1) participating in, (2) financing, or (3) directly interested in the labor dispute, and (B) did not belong to a trade, class or organization of workers members of which were employed where the labor dispute occurred and were (1) participating in, (2) financing, or (3) directly interested in the dispute. Sup. 1941, § 718f(b)(3). The burden rested on each plaintiff, therefore, to establish that as an individual he was not within any of the alternatives of (A) and further that as a member of a trade, class or organization he was likewise not within those of (B). *Auker* v. *Review Board,* 117 Ind. App. 486, 494, 71 N. E. 2d 629; *In re Polson Lumber & Shingle Mills,* 19 Wash. 2d 467, 479, 143 P.2d 316. We shall not refer to the second alternative in (A), since the company does not press any claim of disqualification

arising thereunder. Nor shall we specifically discuss (B), since our comments as to (A) are in large measure applicable by analogy to (B).

The company maintains, first, that the plaintiffs did not escape disqualification, since they participated in the labor dispute by refusing to cross the picket line. The claim is that the plaintiffs refrained from doing so in order that, by further crippling the activities of their employer, they might advance the cause of the strikers. If such was the fact, the plaintiffs were obviously participating in the dispute and hence were ineligible to receive benefits under the act. When an employee has the choice of crossing the picket line or of refusing to do so because of his adherence to the written or unwritten law of his union, his unemployment, if any, is voluntary. *In re St. Paul & Tacoma Lumber Co.,* 7 Wash. 2d 580, 595, 110 P.2d 877. This choice, which members of organized labor are frequently called upon to make, has always been deemed a voluntary one. *Baldassaris* v. *Egan,* 135 Conn. 695, 699, 68 A.2d 120; *Bodinson Mfg. Co.* v. *California Employment Commission,* 17 Cal. 2d 321, 328, 109 P.2d 935. Voluntary idleness is not involuntary unemployment. The test to be applied in determining whether a person's refusal to cross the line renders him a participant in the dispute is, therefore, whether his refusal was voluntary or involuntary. *Aitken* v. *Unemployment Compensation Commission,* 136 N.J.L. 372, 374, 56 A. 2d 587. Since this test is subjective, it may well prove difficult of application, but until the legislature adopts one of a different character we are bound to apply it.

It occasionally happens, as here, that fear of bodily harm may become an important, and at times a decisive, factor in determining whether the unem-

ployment of a person was voluntary or not. When prevailing conditions create in him a real and genuine fear that, in reasonable probability, he will suffer personal injury should he attempt to cross the picket line, his refusal for that reason to make the attempt will be deemed involuntary. *Steamship Trade Assn.* v. *Maryland Unemployment Compensation Board,* 190 Md. 215, 220, 57 A.2d 818. The panel found that the probability of injury to the plaintiffs existed from November 7, 1945, until April 8, 1946. It further found that although the plaintiffs "may have felt that [they] should not cross such a line, [they] also had a very distinct and very reasonable fear that an attempt by any clerical employee to cross the picket line would place such an employee . . . in a position of extreme danger." It did not find, however, the reason why the plaintiffs failed to return to work. We are left in the dark as to whether the determinative reason for the refusal of each to cross the line was fear or whether it was a desire to abide by union traditional practice. If the latter reason was a substantial factor in the decision of each plaintiff, he is disqualified even for the first four weeks of the strike. Until the finding is clarified upon this important aspect of the case, the award cannot be sustained either wholly or in part. Since the panel has failed to make a finding on this issue and since such a finding is necessary to support its conclusions of law, the company's appeal must be sustained. The matter must be remanded for a finding of what the fact is upon this issue. *Almada* v. *Administrator,* 137 Conn. 380, 391, 77 A.2d 765.

The other alternative relied upon by the company as a ground for disqualification is that the plaintiffs failed to prove that they were not directly interested in the labor dispute. As indicated above, our act

provides that an employee, although not participating in or financing the dispute, is nevertheless disqualified if he is directly interested in it. Sup. 1941, § 718f (b)(3)(A). The expression "directly interested in" has a different meaning from that of "participating in" the dispute. *Local No.* 658 v. *Brown Shoe Co.,* 403 Ill. 484, 490, 87 N.E.2d 625. An employee is "directly interested in" a labor dispute if his wages, hours or working conditions will be affected by the outcome of the dispute. *Nobes* v. *Unemployment Compensation Commission,* 313 Mich. 472, 480, 21 N.W.2d 820; *Huiet* v. *Boyd,* 64 Ga. App. 564, 568, 13 S.E.2d 863. While the memorandum of decision filed with the award shows that the panel gave general consideration to the question of "direct interest in," the finding lacks the facts concerning the activities of Sturm and the executive committee of Local 90 which the company maintains are essential to the proper presentation of its claims of law. The panel should have found such facts, if any, as bear upon the ultimate question whether the plaintiffs were directly interested in the strike.

The original panel consisted of the commissioners of the first, second and third districts. We take judicial notice of the fact that two of the members are no longer unemployment commissioners. The statute provides that "[i]f any commissioner . . . shall die or his term end before the final settlement of any matter in which he has been acting in his official capacity, his successor in office or a commissioner designated by the chairman may continue such matter to its completion." General Statutes § 7510. If the original panel was legally capable of functioning, the directive in the remand of the Superior Court could limit the presentation of relevant evidence, if any, to that which would be necessary to

make findings on the specific subjects to which we have referred. See *France* v. *Munson,* 125 Conn. 22, 27, 3 A.2d 78; *Glodenis* v. *American Brass Co.,* 118 Conn. 29, 33, 170 A. 146. For reasons so obvious that they require no recital, a panel with at least two new members cannot be so limited. They should hear the case de novo and make their own finding and award in conformity with this opinion.

There is error on both appeals, the judgment is set aside and the matter is remanded to the Superior Court for the rendition of a judgment returning it to a panel composed of the commissioners of the first, second and third districts, subject to such substitution as may be ordered by the chairman of the commission pursuant to § 7510, for a rehearing and a finding of facts and award in accordance with this opinion.

In this opinion the other judges concurred.