## Vermont Securities, Inc. v. Vermont Unemployment Compensation Commission

[104 A2d 915]

February Term, 1954.

Present: Sherburne, C. J., Jeffords, Adams and Chase, JJ., and Sylvester, Supr. J.

Opinion Filed May 4, 1954.

*Gannett & Oakes* for the petitioner.

*F. Elliott Barber, Jr.*, Attorney General and *Raymond S. Fitzpatrick* for the petitionee.

**Sherburne, C. J.**   This is a petition for a writ of certiorari to review the action of the Unemployment Compensation Commission denying the petitioner's claim for a refund, under the provisions of V. S. 47, §5372, of the contributions paid by it to such commission during the period from January 1, 1949 to December 30, 1951.   The facts found by the commission, and the additional facts which it is agreed may be treated as found, have been placed in the record by the stipulation of the parties, and it is agreed that the conclusions of the commission may be treated as based upon the facts found together with such additional facts.   The stipulation also lists certain exceptions to the findings, to the failure to find and to the conclusions of law made by the commission, which it is agreed may be treated as having been seasonably taken by the petitioner, and which were allowed after this petition was brought.   Our disposition of the questions raised should not be taken as indorsing this method of bringing the cause here.

So far as here material the facts set forth in the stipulation may be summarized as follows:. The petitioner is a Vermont corporation engaged in buying and selling bonds, stocks and securities on its own account as a broker. It operates in Vermont, Massachusetts and New Hampshire and is subject to the securities laws of those states and of the Federal government. During the period in question it employed from five to seven salesmen under an oral agreement which either the petitioner or salesman had the right to terminate at any time. The petitioner is registered with the department of banking and insurance as a broker and the authority from this department to each salesman to sell securities is in the form of a license which sets out that he is licensed to act as salesman for the petitioner. All licenses are procured and paid for by the petitioner. The salesmen are paid on a straight commission basis of 60% of the commission on sales collected by the petitioner. Commission payments are made periodically by it to the salesmen. The agreement contemplates that the salesmen will each in his own name as representing the petitioner contact prospective customers and attempt to interest them in the purchase, and sometimes the exchange of securities. They are asked to conduct themselves and work for the best interests of the petitioner. They may not sell securities for other firms. Their customers constitute their friends, and anyone they think has money to invest. The salesmen contact them where they may be found, but not at the petitioner's offices with but few exceptions and these only by chance. Only two or three have drawing accounts. They operate from their own offices or homes, where they may or may not have what can properly be called offices. They own the equipment which they use in selling securities and pay their own expenses. They are not required to work regularly; in fact, two of them are engaged in other business activity with the knowledge of the petitioner, but the nature of such activity is not disclosed. The number of orders a salesman takes is largely dependent on the amount of his effort, his acquaintance and selling ability. They are not restricted as to territory in the states in which they are licensed, but the petitioner suggests that they do not call on each other's customers.

They do not and cannot have assistants due to the requirements of the licensing law. There are no restrictions on what a salesman may do after leaving the petitioner. If a salesman stops working for it he will try to take his own customers with him. Before becoming associated with the petitioner some of the salesmen were employed as salesmen and one had sold securities for another company. The license of a previous salesman was not renewed by the petitioners because of complaints received. The petitioner furnishes its salesmen with material and supplies at a cost of not over $100 per year, including lists of suggested securities. In some cases the suggestions as to the securities to be sold are followed by the salesmen and sometimes not. From time to time some investment firms, like the Putnam Fund, pay for advertisements of their securities in which the names of the petitioner and its salesmen have been listed. Salesmen have for some time individually ordered prospectuses from the various firms with which the petitioner has a contact. All sales are subject to confirmation by the petitioner for two reasons: (1) in order to be careful not to sell a security which has not been cleared for sale by law, and (2) in order to be able to make recommendations more beneficial to the customer. It has a right to refuse any sale made by its salesmen. If a customer bought securities directly from it, a salesman who had previously done business with that customer would receive his regular commission. Sales meetings are held not more than three times a year, to which all salesmen are invited but not required to attend, and the majority attend. The salesmen plan to attend and do so if possible. The salesmen are not required to be at, or to show up in person at petitioner's office, but they must report their sales there for confirmation. The petitioner is not a member of any stock exchange, but its salesmen take orders for securities listed on exchanges in order to accommodate their customers. They do not make a commission on such orders, but petitioner makes a service charge and they receive no part of it.

The petitioner's exceptions to the stipulated facts and to the failure to find are not for consideration because not briefed.

The question presented by petitioner's claim for a refund is whether its salesmen were in employment under the unem-

ployment compensation law within the meaning of V. S. 47, §5343, VI. [b], which reads as follows:

"VI. [b]. Services performed by an individual for wages shall be deemed to be employment subject to this chapter unless and until it is shown to the satisfaction of the commission that:

■ Such individual has been and will continue to be free from control or direction over the performance of such services, both under his contract of service and in fact; and

■ Such service is either outside the usual course of the business for which such service is performed, or that such service is performed outside of all the places of business of the enterprise for which such service is performed; and

■ Such individual is customarily engaged in an independently established trade, occupation, profession or business."

No claim is made that the salesmen do not perform services for "wages" as defined in paragraph XII. of this section.

■■ Under the quoted provision all services performed by an individual for remuneration shall be deemed to be employment for the purpose of this law unless all three conditions [1], [2] and [3] are shown to co-exist and to be concomitant, and the failure of one necessarily results in the relationship being one of "employment". Unlike some of the unemployment statutes that may have been adopted in other states our statute contains no mention of the terms "master", "servant" or "independent contractor". It is plain from its terms that the three concomitant conditions bring under the definition of "employment" many relationships outside of the common law concepts of the relationship of master and servant. *State* v. *Stevens*, 116 Vt. 394, 397, 398, 77 A2d 844.

It is unnecessary to decide if the stipulated facts meet conditions [1] and [2] and we pass to the third condition, viz:

"Such individual is customarily engaged in an independently established trade, occupation, profession or business."

▇▇ The adverb "independently" clearly modifies the word "established", and must carry the meaning that the trade, occupation, profession or business was established, independently of the employer or the rendering of the personal service forming the basis of the claim. The present tense "is" indicates the individual must be engaged in such independent activity at the time of rendering the service involved. "Customarily" means usually, habitually, regularly. *Fuller Brush Co.* v. *Industrial Comm.*, 99 Utah 97, 104 P2d 201, 129 ALR 511. The language used contemplates that one engaged in an independently established trade, occupation, profession or business has a proprietary interest therein to the extent that he can operate it without hindrance from any individual whatsoever. *Murphy* v. *Daumit*, 387 Ill. 406, 56 NE2d 800; *Life and Casualty Ins. Co.* v. *Unemployment Comp. Comm.*, 178 Va 46, 16 SE2d 357. An established business is one that is permanent, fixed, stable and lasting. *Unemployment Comp. Comm.* v. *Collins*, 182 Va 426, 29 SE2d 388.

So construed, it cannot be inferred from the stipulated facts that petitioner's salesmen are or were customarily engaged in an independently established trade, occupation, profession or business.

The only authority cited by the petitioner in support of its claim that its salesmen are in an independently established occupation or business, is a commission ruling or general counsel opinionr elative to real estate salesmen in Virginia. There real estate salesmen compensated solely by commission are exempted from its unemployment compensation act. Par. [7] [o] § 60-14; Title 60, Vol. 9, Code of Va 1950.

*Petition dismissed with costs.*