## DAW'S CRITICAL CARE REGISTRY, INC. *v.* DEPARTMENT OF LABOR, EMPLOYMENT SECURITY DIVISION

SUPERIOR COURT

JUDICIAL DISTRICT OF
DANBURY

FILE NOS. CV-88-0295073
CV-88-0295074

Memorandum filed April 29, 1992

*Garrison & Arterton,* for the plaintiff.

*Richard T. Sponzo,* assistant attorney general, with whom was *Richard Blumenthal,* attorney general, for the defendant.

HON. ARTHUR H. HEALEY, STATE TRIAL REFEREE. These two cases[1] are appeals[2] from assessments by the defendant department of labor, employment security division (defendant) pursuant to General Statutes § 31-270[3]

---

[1] These two appeals were referred to the author as a state trial referee.

[2] These two appeals are identical and raise the same issues except that Docket No. CV-88-0295073 concerns the unemployment compensation tax assessment for 1986 and 1987 while Docket No. CV-88-0295074 concerns the unemployment compensation tax assessment for 1985.

[3] General Statutes § 31-270 provides: "FAILURE OF EMPLOYER TO FILE REPORT OF CONTRIBUTIONS DUE. APPEAL FROM ACTION OF ADMINISTRATOR. If an employer fails to file a report for the purpose of determining the amount of contributions due under this chapter, or if such report when filed is incorrect or insufficient and the employer fails to file a corrected or sufficient report within twenty days after the administrator has required the

for unemployment taxes based on the defendant's determination that nurses furnished by the plaintiff, Daw's Critical Care Registry, Inc.[4] (Daw's), to medical facilities[5] are employees of Daw's under the Connecticut Unemployment Compensation Act (act) and not independent contractors as Daw's contends.

Daw's took appeals to the Superior Court maintaining that its nurses, whom Daw's treated as independent contractors, were not, as the defendant determined, employees under the act. Daw's alleges that this determination of the defendant is incorrect as a matter of both fact and law because the status of the nurses in dispute is that of independent contractors. Daw's also alleges that the defendant's assessments

same by written notice, the administrator shall determine the amount of contribution due, with interest thereon pursuant to section 31-265, from such employer on the basis of such information as he may be able to obtain and he shall give written notice of such determination to the employer. Such determination shall be made not later than three years subsequent to the date such contributions became payable and shall finally fix the amount of contribution unless the employer, within thirty days after the giving of such notice, appeals to the superior court for the judicial district of Hartford-New Britain or for the judicial district in which the employer's principal place of business is located. Said court shall give notice of a time and place of hearing thereon to the administrator. At such hearing the court may confirm or correct the action of the administrator. If the action of the administrator is confirmed or the amount of the contribution determined by the administrator is increased, the cost of such proceedings, as in civil actions, shall be assessed against the employer. No costs shall be assessed against the state on such appeal. The amount of any judgment rendered in such proceedings, with costs, shall be collected either on execution, as provided in civil actions, or as provided in section 31-266."

[4] Daw's was established in 1982 and was solely owned and operated by Karen Whyko until its incorporation in 1985 as Daw's Critical Care Registry, Inc.

[5] The parties have stipulated that the business of Daw's from 1985 through 1987, was to provide registered nurses and licensed practical nurses to medical facilities including hospitals, nursing homes, visiting nursing services and physicians' offices. The term "nurses" in this opinion will be used to refer to both registered nurses and licensed practical nurses unless otherwise noted, and the term "medical facilities" will be used to refer to those facilities set out in the stipulated facts.

under the act are illegal and improper. In the event, however, that the assessments by the defendant are legal and found to be owing by Daw's under the act, Daw's asserts that they should be due only prospectively and not retroactively.

In its appeals, Daw's seeks a hearing and review of the determinations and assessments made by the defendant, and an order correcting and vacating the assessments and determinations, or for such other proper order as the court deems just. The defendant admits that he made the determination that these nurses are employees of Daw's under the act and that assessments of amounts due under the act have been forwarded to Daw's. The defendant, however, denies that this determination is incorrect, either factually or legally, as well as denying that the assessments may not be made due retroactively.

The procedural history of these cases deserves some comment. In that regard, the record of the proceedings prior to the actual appeals is illuminating. Pursuant to the request of G. Joseph George, a field auditor of the employment security division of the defendant, Daw's made available its books and records in response to a letter asking for an examination of them as they related to the provisions of the act. Daw's cooperated and George conducted his audit. A postaudit "discussion" was held on March 16, 1988, at which George, David Delaney, Waterbury area field service representative, Joseph Whyko, president of Daw's, and his attorney, Joseph Garrison, were present. Thereafter, in April, 1988, George issued his written report in which he concluded that all the nurses involved were, under the ABC test,[6] employees and not independent contractors and that remunerations paid to such nurses were to be

---

[6] The ABC test is contained in General Statutes § 31-222 (a) (1) (B) (ii).

"treated as liable wages subject to the [Unemployment Compensation Law] . . . ." According to the record, upon the presentation of the original assessment, the defendant's written report (report) was discussed at the March 16, 1988 meeting. According to the defendant, Daw's was given the opportunity at the March 16, 1988 meeting for another conference "at which point . . . [Daw's] might wish to pay the amount . . . due, or . . . provide any material or further argument to dispute the findings of [the] audit. [Daw's] declined and was advised that a formal assessment would be sent and that it could be appealed to the Superior Court." Thereafter, a formal assessment of moneys claimed to be due under the act was made. These two appeals followed.

These appeals come before this court in a somewhat unusual posture. The record of the proceedings before the defendant, as certified, contains, inter alia, the report, which makes certain factual findings and concludes that the remuneration paid to the nurses should be treated as "wages" under the act, specifically General Statutes § 31-222, under which it was determined that they were "employees" and not independent contractors as Daw's claimed. It also includes an assessment of the taxes with interest the defendant found owing from Daw's for the tax years involved. The record further states, as noted above, that Daw's was given the opportunity for another conference. Thereafter, a formal assessment was sent to Daw's, and it was formally advised in writing that any appeal from the defendant's determination that the nurses were "employees" and not "independent contractors" was to be taken to the Superior Court under § 31-270. There is no transcript of any sort in the record.

After the appeals had been returned to court, the parties then filed a long "Stipulation of Facts," containing eighty-two separate facts, which had appended to

it a number of exhibits. In addition, they also filed a "Stipulation of Joint Exhibits" as well as a "Stipulation of Operative Pleadings." In addition, at the trial, both parties adduced evidence through a number of witnesses and introduced additional exhibits. This entire procedure was agreed upon between the parties.

The manner in which these appeals come to this court, it is thus fair to say, resulted from the conduct of the parties concerning what occurred from the outset of their interaction since the audit proceedings were instituted against Daw's by the defendant. The court notes, as does Daw's, that our Supreme Court has recently said that "[t]he scope of review in an appeal from an assessment of unemployment tax contributions under General Statutes § 31-270 is less than clear. See *Beaverdale Memorial Park, Inc.* v. *Danaher,* 127 Conn. 175, 181–83, 15 A.2d 17 (1940) . . . ." *Latimer* v. *Administrator,* 216 Conn. 237, 245 n.9, 579 A.2d 497 (1990). Daw's points here to *Latimer's* citation of *Beaverdale* and claims that where the original assessment was made ex parte and without notice the appellant is entitled, under the constitution, to a full hearing after notice and that upon such hearing the court shall correct the assessment. Id. Daw's claims that in *Latimer* the trial court was permitted to restrict its review to the record developed at the administrative level because, "[a]lthough not provided by statute, the parties agreed to an elaborate procedural arrangement that contemplated and resulted in a full scale hearing before a hearing officer with a resultant finding of facts and a decision." Id. The *Latimer* court stated: "To ignore the finding of facts and the conclusion of the hearing officer and to treat this appeal as a de novo proceeding would defy common sense and go against the grain of what the parties obviously intended." Id. The *Latimer* court concluded that "[t]he trial court did

not err by restricting its review to the record developed at the administrative hearing." Id. In contrast to *Latimer*,[7] Daw's argues, no such hearing has been held in these cases but rather, the defendant's decision was the product of a simple audit at the end of which Daw's was presented with a fait accompli. Parenthetically, "[a] 'hearing' is generally defined as a '[p]roceeding of relative formality . . . generally public, with definite issues of fact and of law to be tried, in which . . . *parties proceeded against have [a] right to be heard . . . .*' (Emphasis added.) Black's Law Dictionary (5th Ed.)." *Herman* v. *Division of Special Revenue*, 193 Conn. 379, 382–83, 477 A.2d 119 (1984). Daw's then contends that, in "keeping" with *Beaverdale* and the "strong suggestion" of *Latimer,* it is now entitled to a "full and fair hearing" before this court in which all the relevant evidence can be presented and considered. Daw's asserts that its claim here is strengthened by the conduct of the attorney general's office, which through extensive discovery by deposition, interrogatories and multiple sets of requests for admissions, has come quite close, to use the language of Daw's, to treating these appeals as ones "in which the 'administrative record,' such as it is, is a sidelight and [so] a de novo hearing is required."

---

[7] Unlike *Latimer* v. *Administrator*, 216 Conn. 237, 245 n.9, 579 A.2d 497 (1990), where "[a]lthough not provided by statute, the parties agreed to an elaborate procedural arrangement that contemplated and resulted in a full scale hearing before a hearing officer with a resultant finding of facts and a decision," here there was no full scale hearing or anything of that nature before a hearing officer on these appeals. There is also no transcript in the record of what happened when representatives of Daw's and the defendant met at the postaudit discussion before the issuance of the formal assessment of tax liability. It should also be pointed out that the written stipulation of facts entered into, in large measure, includes, if not in haec verba, whatever facts were found by the defendant. The live testimony before this court, while in much more detail than the "factual findings" by the defendant at the agency level, will along with all the stipulations be accorded their proper place in determining whether the defendant's conclusions are arbitrary, unreasonable or illegal.

On the other hand, the defendant, referring to its pretrial brief concedes that it did not hold a formal hearing as in *Latimer*, but argues that it did "[make] findings of fact and conclusions of law underlying [the defendant's] assessment." The defendant claims that those are contained in the April 4, 1988 report that resulted in the assessment. The defendant contends that "[t]o the extent that the factual basis for the assessment coincides with the facts found on appeal, the court is similarly limited to determining whether the agency's conclusions in the assessment are unreasonable, arbitrary or illegal, and the court should accordingly give considerable deference to those conclusions." In addition, the defendant claims that "[w]hile the court may consider further evidence [on these appeals], it should defer to the agency's conclusions if based on the same facts ultimately found by the court." Finally, in that earlier brief the defendant maintains that "[t]he proper standard of judicial review is whether the [defendant] could reasonably have concluded in [its] assessment, on a factual basis followed by the court, that [Daw's] failed to sustain its burden of showing that it satisfied each part of the ABC test."

The defendant states in its posttrial brief that: "Regardless of the status of this proceeding as a trial de novo on factual issues, the principle of deference to the agency's legal conclusions cited in *Latimer* and other cases is based on the agency's expertise in the law and in drawing legal conclusions from facts, regardless of the party or the manner of finding the facts and the actual finding of facts by the agency in those cases. Accordingly, it is entirely irrelevant for purposes of deference to the agency's legal conclusions that the facts here are found by the court rather than the agency as long as the facts ultimately found by the court coincide with those upon which the agency's legal conclu-

sions were based." It is in this somewhat unusual fashion that this court is presented with these appeals.

An examination of the case law indicates that the function of a trial court, in reviewing such decisions of the defendant is to determine whether the defendant acted unreasonably, arbitrarily or illegally. See, e.g., *Latimer* v. *Administrator,* supra, 245 n.9; *Burnham* v. *Administrator,* 184 Conn. 317, 322, 439 A.2d 1008 (1981); *Oppenheimer* v. *Administrator,* 177 Conn. 593, 596, 419 A.2d 337 (1979); *Lanyon* v. *Administrator,* 139 Conn. 20, 28, 89 A.2d 558 (1952). In doing so, the trial court cannot substitute its own conclusions for those of the defendant. *Kaplan* v. *Administrator,* 4 Conn. App. 152, 153, 493 A.2d 248 (1985).

"The standard for review of administrative proceedings similarly must allow for judicial scrutiny of claims such as . . . error in the construction of the administrative agency's authorizing statute." *Burnham* v. *Administrator,* supra. On appeal this court cannot decide the appeal on a ground that was not presented to the defendant below because to do so would deprive the defendant of an opportunity to consider such a ground. Id., 323; see *Neri* v. *Powers,* 3 Conn. App. 531, 539, 490 A.2d 528, cert. denied, 196 Conn. 808, 494 A.2d 905 (1985). There have been circumstances, however, where if the record on appeal from an administrative board "does not sufficiently disclose the basis of its action," then it has been said, the appellant is permitted to "offer evidence before the court as to the facts, and the court will act on the assumption that they were the basis upon which the board reached its decision." *Jaffe* v. *State Department of Health,* 135 Conn. 339, 354, 64 A.2d 330 (1949); see *Hotchkiss Grove Assn., Inc.* v. *Water Resources Commission,* 161 Conn. 50, 57, 282 A.2d 890 (1971). That problem is absent in the present case as the defendant definitely decided, as the basis of its action, that Daw's did not satisfy any

prong of the ABC test. The Superior Court has been allowed to hear evidence "to clarify the basis of the commissioner's decision . . . ." *Sachem's Head Assn. v. Lufkin,* 168 Conn. 365, 366, 362 A.2d 519 (1975). This court approaches these appeals mindful of the standard of review set out, the unusual procedure adopted by the parties, i.e., the stipulation of facts and certain exhibits as well as the extensive discovery[8] undertaken by the attorney general's office, and the live testimony of some eleven witnesses at the trial before this court as well as the admission of certain additional exhibits at that trial.

The report initially indicates: "The EMPLOYER [Daw's] conducts a professional nurse agency that provides registered nurses and licensed practical nurses from its list of qualified persons to various health institutions, hospitals, etc. [medical facilities] on an as needed basis. [Daw's] invoices the [particular medical facility] for all [such nurses] requested and provided. [Daw's] in turn pays wages to each [nurse] that has been assigned to [a particular health] institution. The difference between the amount [Daw's] invoices the institution and the amount [Daw's] pays in wages to the

---

[8] The defendant has filed three separate sets of requests for admissions, which totaled some 141 requests to admit. See Practice Book § 238 et seq. Daw's replied to these in a timely fashion. During the presentation of evidence before this court only one of the 141 requests was referred to. After all the witnesses had testified and the other exhibits had been admitted, the defendant then offered into evidence all those requests that had been admitted in whole or in part by Daw's, and they were admitted into evidence. The purpose of admitting requests for admissions into evidence is to give the party against whom the admissions are to be used "an opportunity to test their evidentiary competence or to illuminate their significance." *Falcone* v. *Night Watchman, Inc.,* 11 Conn. App. 218, 219 n.1, 526 A.2d 550 (1987). Where, however, evidence contrary to any request admitted in whole or in part came into evidence without objection, prior to the introduction into evidence of any such requests, the defendant here is held to have waived his right to rely conclusively on any such admission. See *Larson* v. *Fazzino,* 216 Conn. 431, 435–36, 582 A.2d 179 (1990).

[nurses it assigns] is [Daw's] gross profit. [Daw's] issues [United States Income Tax Form 1099] annually to the [nurses] but it contends that [the nurses] are outside contractors. [Daw's] maintains a list of nurses. Clients [i.e., a medical facility] contact [Daw's] requesting the services of a nurse. [Daw's] calls nurses from the list until they find one who accepts the assignment. [Daw's] bills the [medical facility] a pre-negotiated fee. [Daw's] pays the nurse a pre-negotiated wage for the services provided. [Daw's] maintains that the nurses were not [its] employees but are actually independent contractors due to their professional status.''

The report then states that ''[b]ased on Connecticut Statutes, it is clear that these nurses are the employees of [Daw's]. The principal business activity of [Daw's] is to provide temporary or occasional nursing assistance to a client on request.''

It goes on stating: ''Connecticut State Labor Law [§] 31-129 (e) states: 'Temporary help service' means any person conducting a business which consists of employing individuals directly for the purpose of furnishing part-time, or temporary help to others. By this definition the Employer is a temporary help service. Temporary help services have historically reported persons sent to clients on a temporary basis as employees, as an employer/employee relationship exists under Common Law.''

The report continues: ''Application of Section 31-222 (a) (1) (B) (ii) (also known as the ABC test) of the Connecticut Unemployment Compensation Law demonstrates employment as follows: A. DIRECTION AND CONTROL. 1) If the EMPLOYER determines the nurses to be competent, they are placed on the EMPLOYER'S roster (the equivalent of being hired). 2) If the EMPLOYER receives negative reports from the clients, or after further contact with the nurse, the Employer infers that the nurse is incompetent, [it]

could remove the nurse's name from the roster (equivalent of being fired). 3) The Internal Revenue Service has ruled in Revenue Ruling 61-196 . . . that: 'Hospitals, clinics, nursing homes, public health agencies, etc. engage registered nurses on a full time basis as a part of their regular staffs. The nurses work for a salary and follow prescribed routines during fixed hours. Although their duties are professional in nature, these nurses lose their individuality by integrating their services into the employer's business and by the employer's right to set the order of and supervise their services.'

"Revenue Ruling 75-101 . . . in part states: 'A company that is in the business of furnishing the services of licensed practical nurses, engages, such [nurses] pursuant to oral contracts. . . . [T]he nurse performs professional nursing services as a licensed practical nurse for the clients of the company. The nurse represents the company, her services are periodically checked by the company, she is issued instructions, paid on a weekly basis, and her services may be terminated by the company. The [nurse is] not engaged in an independent enterprise in which [she assumes] the risk of profit and loss. Since she is a skilled worker, she does not require constant supervision. . . . Accordingly, it is held that the company retains the right to exercise over the nurse the degree of control and direction necessary to establish the relationship of employer and employee and, therefore, the nurse is an employee of the company. . . .' "

On part A of the ABC test the report concludes: "The facts in this case are similar in that the services of the EMPLOYEES are integrated into the business of the employer, direction and control is exercised and the EMPLOYER has the right to discharge the employee."

Turning to part B the report states: "B. WORK PER-FORMED OUTSIDE THE USUAL COURSE OF BUSINESS OR PLACE OF BUSINESS. 1) The EMPLOYER'S business (and profit) depend on the placement of these qualified nurses on a temporary basis into the locations of their clients. In essence, the placing of these nurses is the usual course of business of the EMPLOYER. 2) The client's location becomes a place of business of the EMPLOYER."

As to part C of the ABC test the report states: "C. THE INDIVIDUAL IS CUSTOMARILY ENGAGED IN AN INDEPENDENTLY ESTABLISHED PROFESSION OF THE SAME NATURE AS THAT INVOLVED IN THE SERVICE PERFORMED. 1) The EMPLOYER issued 1099's in error. As the nurses were employees, taxes should have been withheld and W-2's issued. 2) Nurses working for other agencies would be employees of the other agencies while they were performing service for them. 3) The nurses lose their independent status when employed by a temporary agency. 4) The nurses are paid on an hourly basis and are not at risk for profit or loss. The nurses would be paid by the company whether or not the client pays the company. 5) The clients are doing business with the company for the purpose of obtaining the services of temporary employees."

The report then sets out its ultimate conclusions as follows: "THEREFORE, all remuneration paid to these nurses should be treated as liable wages subject to the [Unemployment Compensation Law] based on the follow-ing: A) Sec. 31-222 (b) (1) which states that 'Total Wages' means all remuneration for employment. . . . B) Sec. 31-222 (a) (1) (B) (ii) which states '. . . Service per-formed by an individual shall be deemed to be employment subject to this chapter irrespective of whether the Com-mon Law relationship of master and servant exists, unless it is shown to the satisfaction of the adminis-

trator . . . an independent contractor relationship exists under the ABC Test.' C) The application of the ABC Test clearly shows that an employer/employee relation exists as previously demonstrated. However, if any person reading this report is unclear if the relationship exists, [that person] must take into account Sec. 31-274 (c) which states 'the provisions of this chapter shall be construed, interpreted and administered in such a manner as to presume coverage . . . in doubtful cases.' D) Sec. 31-272 states 'No agreement by an employee to waive, release or commute his rights to benefits or any other rights under this chapter shall be valid.' . . ."[9]

Before going into an analysis certain relevant legal principles are noted. Under § 31-222 (a) (1) (A) of the act the term "employment" means "[a]ny service . . . performed under any express or implied contract of hire creating the relationship of employer and employee . . . ." Section 31-222 (a) (1) (B) (ii) of the act provides, inter alia, that "employment" means: "Service performed by an individual shall be deemed to be employment subject to this chapter irrespective of whether the common law relationship of master and servant exists, unless and until it is shown to the satisfaction of the administrator that (I) such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; and (II) such service is performed either outside the usual course of the business for which the service is performed or is per-

---

[9] At the end of the report, dated April 4, 1988, this paragraph was included: "Upon presentation of the assessment based upon the audit of the records, the aforementioned factors were discussed. The employer was given the opportunity to have another conference at which point that he might wish to pay the amount found to be due, or to provide any material or further argument to dispute the findings of this audit. The employer declined and was advised that a formal assessment would be sent and that it could be appealed to the Superior Court."

formed outside of all the places of business of the enterprise for which the service is performed; and (III) such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . ." This is the act's ABC test.

This statute, as it presently stands, not only codifies common law rules used to determine the existence of an employer-employee relationship, but also incorporates what is "known in Connecticut and throughout the country in similar legislation as the 'ABC test.' The ABC test is [used] to ascertain whether an employer-employee relationship exists under the act." *Latimer* v. *Administrator,* supra, 246; *F.A.S. International, Inc.* v. *Reilly,* 179 Conn. 507, 511, 427 A.2d 392 (1980). For the plaintiff to prove that it is not an employer and, thus, has no liability under the act for unemployment taxes, it must show that it has satisfied all three prongs of the ABC test. *Latimer* v. *Administrator,* supra, 246–47. In other words, the ABC test is conjunctive; all three parts must be satisfied in order to exclude an " 'employer from the [Unemployment Compensation] Act.' " Id., 247; see *F.A.S. International, Inc.* v. *Reilly,* supra. Thus, Daw's, in claiming an exemption from payment of unemployment taxes under the ABC test has the burden of proving that it comes within that exception, and exemptions to statutes are to be strictly construed. *Conservation Commission* v. *Price,* 193 Conn. 414, 424, 479 A.2d 187 (1984); *Aaron* v. *Conservation Commission,* 183 Conn. 532, 549, 441 A.2d 30 (1981). This court is aware of § 31-274 (c) of the act, which provides that: "The provisions of this chapter [unemployment compensation] shall be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases." While it may be difficult for a situation to exist where an "employer" sustains his burden of proof

under the ABC test as it did in *F.A.S. International,* it is important to consider that "[t]he exemption [under the Unemployment Compensation Act] becomes meaningless if it does not exempt anything from the statutory provisions"; *Erspamer Advertising Co.* v. *Department of Labor,* 214 Neb. 68, 75, 333 N.W.2d 646 (1983); where the law and the facts merit the exemption in a given case.

In this matter Daw's maintains that it has proven nonliability under the ABC test while the defendant maintains that Daw's has failed to satisfy any prong of the ABC test. Daw's vigorously claims that the application of the *F.A.S. International* case to the facts requires judgment in its favor, while the defendant claims that Daw's "reliance on *F.A.S.* [as to part B of the ABC test] is absurd." The defendant, in asserting Daw's liability, also argues that "the specific criteria identified in *Latimer* [as to part A of the ABC test] are satisfied" in an "incredibly transparent fashion." Daw's, on the other hand, asserts that it has satisfactorily proved every prong of the ABC test, and claims that it is "unfathomable" that the defendant has not conceded here, the satisfaction of part B of the test as he did in *F.A.S. International.* It does bear pointing out that all three prongs were passed upon in *F.A.S. International,* whereas in *Latimer* the court's holding only concerned part A because, as that court said, it was "unnecessary [for the court] to consider prongs B or C." *Latimer* v. *Administrator,* supra, 252.

I

In taking up the ABC test in the present case, part A will be examined first. Under that part Daw's bore the burden of proving under the statute that its nurses have "been and will continue to be free from any control or direction" in connection with the performance of such service, " ' both under [their] contract [for the performance of service] and in fact . . . .' " *F.A.S. International,*

*Inc.* v. *Reilly,* supra, 511–12. "Part A of the test invokes essentially the same criteria as the independent contractor test at common law." Id., 512.

"The fundamental distinction between an employee and an independent contractor depends upon the existence or nonexistence of the right to control the means and methods of work. *Beaverdale Memorial Park, Inc.* v. *Danaher,* [supra, 179]; *Northwestern Mutual Life Ins. Co.* v. *Tone,* 125 Conn. 183, 190, 4 A.2d 640 (1939); *Norwalk Gaslight Co.* v. *Norwalk,* 63 Conn. 495, 524, 28 A. 32 (1893); see *Yurs* v. *Director of Labor,* 94 Ill. App. 2d 96, 103, 104, 235 N.E.2d 871 (1968). The test of the relationship is the right to control. It is not the fact of actual interference with the control, but the right to interfere, that makes the difference between an independent contractor and a servant or agent. *Hartley* v. *Red Ball Transit Co.,* 344 Ill. 534, 539, 176 N.E. 751 (1931). *Caraher* v. *Sears, Roebuck & Co.,* 124 Conn. 409, 413–14, 200 A. 324 (1938). An employer-employee relationship does not depend upon the actual exercise of the right to control. The right to control is sufficient. [*Caraher* v. *Sears, Roebuck & Co.,* supra]; *Zimmer-Jackson Associates, Inc.* v. *Department of Labor,* 231 Mont. 357, 361, 752 P.2d 1095 (1988); *Prime Kosher Foods, Inc.* v. *Bureau of Employment Services,* 35 Ohio App. 3d 121, 123, 519 N.E.2d 868 (1987). The decisive test is who *has the right* to direct what shall be done and when and how it shall be done? Who has *the right of general control? Thompson* v. *Twiss,* 90 Conn. 444, 447, 97 Atl. 328 [1916]. (Emphasis added.) *Caraher* v. *Sears, Roebuck & Co.,* supra, 413; *Northwestern Mutual Life Ins. Co.* v. *Tone,* supra, 191; *Bennett* v. *Department of Employment Security,* 175 Ill. App. 3d 793, 797, 530 N.E.2d 541 (1988)." (Internal quotation marks omitted.) *Latimer* v. *Administrator,* supra, 248. An independent contractor has been said to be " 'one who, exercising an independent employment, contracts to do a piece of work accord-

ing to his own methods and without being subject to the control of his employer, except as to the result of his work.' " *Darling* v. *Burrone Bros., Inc.,* 162 Conn. 187, 195, 292 A.2d 912 (1972), quoting with approval from *Alexander* v. *R. A. Sherman's Sons Co.,* 86 Conn. 292, 297, 85 A. 514 (1912). Only recently our Supreme Court has said that: "This definition has been amplified in subsequent cases but at no time has the basic principle been altered." *Silverberg* v. *Great Southwest Fire Ins. Co.,* 214 Conn. 632, 639, 573 A.2d 724 (1990).

The analysis in the report as to part A, which it captions "DIRECTION AND CONTROL," will be examined next. The report's part A analysis contains three subdivisions. The first indicates that if Daw's finds the nurses to be "competent," they are placed on a roster, which the report notes, is "the equivalent of being hired." While "competent" may not quite be used here in its commonly accepted sense, it is apparent that to be "competent," the nurse had to show that she or he held a currently valid Connecticut nursing license and possessed a certificate of malpractice insurance currently in force. It is difficult to understand how the report could determine this when the record does not indicate that, prior to the time of the report, the defendant had ever heard any evidence. As set out above, there is no transcript of anything that transpired before the assessment appealed from was decided upon. The stipulation of facts and the evidence at trial, however, do support this finding. Second, the report found that if Daw's "receives negative reports from the clients," or after further contact with the nurse, Daw's "infers that the nurse is incompetent," it could remove the nurse's name from the roster, which the report notes is the "equivalent of being fired." Insofar, as the factual basis of this finding in the

report, it is submitted that there is none as again there is no evidence in the record at that time upon which to premise that finding. Insofar as finding justification for that in the stipulations, this the court cannot do. There is also no evidence before this court to prove that "if" Daw's received "negative reports" or after further contact with the nurse, Daw's "infers" the nurse is "incompetent" that Daw's "could" remove the name from the roster, and, in effect, "fire" such a nurse. It is true, however, that for a nurse to be accepted by Daw's for eligibility for assignments, that nurse would have to hold a currently valid Connecticut nursing license and possess a certificate of malpractice insurance currently in force.

It is acknowledged in *Latimer* v. *Administrator*, supra, 249, that the right to terminate "without liability is not consistent with the concept of an independent contract" and is "a strong indication" of an employer-employee relationship. In *Latimer*, however, the court did not consider the conceded retention of that right by the plaintiff as conclusive of the issue of control but did weigh it along with other evidence in its close analysis of that issue. Accordingly, the "right to fire" is to be given the weight *Latimer* indicates with all the evidence on control. It is puzzling to this court how the report could find as a fact or conclude as a matter of law, on its second subdivision of its part A analysis, as it did concerning the equivalent of being hired and fired, when the return of the record filed in court contains no information upon which to base that. Consequently, this court looks to the stipulations filed just prior to trial and to the evidence adduced at trial on this element on the issue of control. Such evidence was presented. There was evidence that tended to indicate that Daw's could terminate any assignment on at least four hours notice for any cause without Daw's being liable except that the nurse

had to be paid for any time she was actually on that assignment. The term "assignment" as fleshed out by the evidence is perceived to be understood as meaning a nurse's undertaking to work at a particular medical facility, for a particular period of time. Despite the fact that no nurse of Daw's was ever terminated, this evidence is to be weighed with all the other evidence on control in accordance with such cases as *Latimer* and *Beaverdale*.

The court is aware that the test of the relationship does not depend upon the actual exercise of the right to control by Daw's but of the existence of the right to control. Daw's did not have the general right to control its nurses in the sense that our cases, including *Latimer,* have perceived that. It had no such control or even the right to control over the means and methods of the nurses' services rendered at their assigned medical facilities. In discussing the right of general control in this context the cases cited point out that the decisive test is who has the right to direct, what shall be done, and when and how it shall be done. Daw's function, after satisfying itself that a nurse was "competent" was fairly limited to arranging times mutually convenient for the nurse and the particular medical facility where the nurse's services were to be rendered and examining a nurse's pay invoices when submitted to it for payment and in making payment. It did not have "the right to general control of the activities." *Latimer* v. *Administrator,* supra, 248. Once the assignment to a particular medical facility was offered by Daw's and undertaken by a Daw's nurse, the nurse went there and, subject to the protocol of that facility, rendered her professional services under that facility's direction.[10] The evidence established that its nurses

---

[10] The defendant places great stress on the decision of the board of review in *Feshler* v. *Hartford Dialysis,* Administrator, Employment Security

could trade shifts after an assignment at a medical facility that Daw's serviced. This was done without the nurse being required to report such shift trades to Daw's although there were instances where, as a matter of professional courtesy, a nurse of Daw's would report a trade shift to Daw's.

Moreover, unlike the personal care assistants (PCAs) in *Latimer,* Daw's did not establish the hours when they were to work. Again, unlike the PCAs in *Latimer* Daw's did not furnish any materials or tools necessary to do their job. Insofar as who furnishes the tools, materials or equipment to be used in the services involved, it is essential to keep in mind the rationale underlying that criterion. When it is the employer who

Appeals Division, Board of Review, Case No. 995-BR-88 (December 27, 1988), in which that board concluded that Hartford Dialysis had not proven that the services performed by the dialysis nurses at Hartford Hospital came within the statutory exception to employment subject to the act under General Statutes § 31-222 (a) (1) (B) (ii). That case found against Hartford Dialysis on all three prongs of the ABC test. *Hartford Dialysis,* a long, well crafted decision, is factually distinguishable from the case presently before this court. In that case, the dialysis nurses involved all worked at the dialysis unit at Hartford Hospital. There, Hartford Dialysis was, unlike Daw's, responsible for and did supervise the nurses' services on those premises. There, the claim of Hartford Dialysis that their hemodialysis council made all decisions regarding staffing and scheduling was found not to be so. The right to discipline and reprimand clearly existed. Actually, it would appear that that very case itself arose because the claimant was terminated for her refusal to service patients testing positive for the acquired immune deficiency syndrome (AIDS) virus. Hartford Dialysis itself had the final approval of how many and which nurses it would use to provide the service. Moreover, it was found that the nurses' responsibilities were "broader than the mere application of the dialysis procedure and" that they were "an integral part of the health care team" rather than independent contractors. Id. *Hartford Dialysis,* unlike here, in undertaking the administration, supervision and management of all dialysis procedures rendered, was properly held to control the "method of providing the dialysis services." Id. This court believes that the factual dissimilarities in *Hartford Dialysis* on the part A issue militate against giving it that weight which the defendant claims.

does so, the inference of right of control in the employer is a matter of common sense and business, otherwise it is not. See 1B A. Larson, Workmen's Compensation Law § 44.34 (b).

The lack of a right to control is further indicated by the proof that no representative of Daw's ever visited a medical facility to check on the performance of any of its nurses. The court also notes that Daw's did not conduct any orientations for its nurses nor did it have any manual of instructions that it issued to them. In this context it is significant to point out that the report, in its third subdivision of its part A analysis, refers to two Internal Revenue Service Rulings (i.e., Revenue Rulings 75-101 and 61-196) and its part A analysis selectively quotes portions of each. An examination of the entire text of Revenue Ruling 75-101 in Internal Revenue Cumulative Bulletin 1975-1 (January—June) is illuminating and merits comment. This ruling does contain a number of circumstances that are found in the present case, but, the report specifically refers also to Revenue Ruling 61-196 which provides that "whether a nurse is self-employed or an employee depends upon the facts and circumstances of each case." In addition, among the background circumstances that were present in Revenue Ruling 75-101, a close examination of that entire ruling discloses the following: "The company issues instructions to the nurse regarding her professional appearance and conduct while on assignment, and periodically checks with each client to determine if the nurse's services are satisfactory. In addition, the company employs a visiting registered nurse, on a full time basis, to make periodic on-the-job visits to evaluate the professional competence of the practical nurse. When appropriate, the visiting nurse has the authority to make recommendations to the practical nurse regarding the care of the patient. It is under-

stood that the practical nurse will follow these recommendations." No such indicia of control were present in the present case as in Revenue Ruling 75-101.

In *Robert C. Buell & Co.* v. *Danaher*, 127 Conn. 606, 18 A.2d 697 (1941), a case involving an assessment under the act, the court had occasion to consider the argument that a ruling by the deputy commissioner of the United States Internal Revenue Service was in the nature of a precedent because the factual situation upon which the IRS ruling offered was based was claimed to be the same as the facts in *Buell*. Our Supreme Court affirmed the trial court's ruling in *Buell* excluding the IRS ruling, noting that it was not binding on the trial court, "which could decide the case only upon the facts before it and the principles of law in effect in this state." Id., 613.

Some medical facilities where the nurses of Daw's had undertaken assignments required that the nurses wear name tags on which appeared "Daw's Critical Care Registry" and the name of the nurse. Wearing name tags was required not by Daw's, but by certain medical facilities that were its clients. This aspect militates for Daw's on the control issue.

There is no question that Daw's processed the invoices submitted to it by its nurses for payment for their nursing services at whatever medical facility they worked. These invoices were on forms provided by Daw's with the time worked indicated and certified to by a supervisor at that particular facility before being processed by Daw's. Payment was at an hourly rate. The defendant, in arguing that the nurses of Daw's are employees, maintains that "the hourly rate of pay criterion is not merely satisfied; instead a comprehensive pay scheme on an hourly and continuing basis during a nurse's performance of service is established." The defendant contends

that the "hourly rate criterion" differs from the payment of an independent contractor at the completion of a project in which the number of hours worked on that project is not taken into account. This court believes otherwise. "The manner of remuneration, whether in wages, salary commission, by piece or job, is not decisive or controlling in determining whether one is an employee or an independent contractor exercising control over the manner of his own work." *Darling* v. *Burrone Bros., Inc.*, supra, 193; see *Bourget* v. *Overhead Door Co.*, 121 Conn. 127, 131, 183 A. 381 (1936). In other words, the method used to determine the payment to be made for the work done is not of "controlling significance." *Caraher* v. *Sears, Roebuck & Co.*, supra, 414. The circumstance that the nurses of Daw's were paid on a weekly or biweekly basis is of little significance where the reality is that the payor (Daw's), in effect, served in the nature of conduit for payment. *Trauma Nurses, Inc.* v. *Board of Review*, 242 N.J. Super. 135, 147, 576 A.2d 285 (1990). The implication that there is a "comprehensive" pay scheme that shows control or the right to it is not borne out by the evidence. There was an uncomplicated hourly rate and for part of the period involved in these cases an uncomplicated vacation bonus arrangement. The attempt to use the time invoices of the nurses to claim that the nurses had to report to Daw's daily as the PCAs did in *Latimer* is simply not so. These were time cards certified to by a facility supervisor as to time worked over a pay period so as to allow Daw's to pay its nurses, and that was all.

The defendant argues that because a nurse who found herself unable to perform an agreed assignment on a given day had to give Daw's four hours notice so as to enable Daw's to find a replacement among its other nurses "certainly constitutes sub-

stantial encouragement of replacement through [Daw's]." What this has to do with control is not wholly clear. If, however, it suggests that Daw's endeavored to replace a "cancelled" assignment with another nurse, Daw's may well have done that in the interest of good business relations with a particular medical facility. Its bearing on control of its nurses, however, again, is not at all clear.

The court agrees with the defendant that in an employment agreement between Daw's and any nurse, that Daw's "does not have or reserve any direction or control of my activities and that [the nurse is] not an agent, servant or employee of DAW'S but an INDE-PENDENT CONTRACTOR" is certainly not controlling. It is, however, entitled to some consideration on the matter of control. See *Burchesky* v. *Department of Employment & Training,* 154 Vt. 355, 361, 577 A.2d 672 (1989); 1 Restatement (Second), Agency § 220 (1958). The primary concern is what is done under the contract. *Latimer* v. *Administrator,* supra, 251.

The court recognizes that an agency's decision is entitled to the presumption of validity. It has been said that: "The agency's practical construction of the statute, if reasonable, is 'high evidence of what the law is.' " *Board of Trustees* v. *Freedom of Information Commission,* 181 Conn. 544, 552, 436 A.2d 266 (1980); *Anderson* v. *Ludgin,* 175 Conn. 545, 556–57, 400 A.2d 712 (1978). It is also acknowledged that a reviewing court is not empowered to substitute its judgment for that of the agency. *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402, 416, 91 S. Ct. 814, 28 L. Ed. 2d 136 (1971). In addition, having in mind the standard of review set out earlier which may be applied, inter alia, to an agency's error on the construction of one of its governing statutes in a given situation; see

*Burnham* v. *Administrator,* supra, 322; a court may conclude that the agency's ultimate conclusion does not meet that standard—and it does not here.

Under all the evidence, the court concludes that the facts found demonstrate that the deference ordinarily accorded the decisions of administrative agencies in construing and applying statutes in their ken; *Preston* v. *Department of Environmental Protection,* 218 Conn. 821, 830, 591 A.2d 421 (1991); cannot be extended to the conclusion of the report that Daw's did not satisfy part A of the ABC test.

## II

Next, the court turns to the analysis of part B of the ABC test of the report captioned: "WORK PERFORMED OUTSIDE THE USUAL COURSE OF BUSINESS OR PLACE OF BUSINESS." That report contains two statements. The first is that: "The EMPLOYER's business (and profit) depend on the placement of these qualified nurses on a temporary basis into the locations of [its] clients. In essence, the placing of these nurses is the usual course of business of the EMPLOYER." The second states that: "The client's location becomes a place of business of the EMPLOYER." Again, while no evidence was taken by the defendant, this court agrees that the business of Daw's did depend, as the evidence before this court shows, upon the placement of qualified nurses on a temporary basis into medical facilities. The court, however, cannot agree that anything in the record at the time of the report demonstrates that the "client's location becomes a place of business of the EMPLOYER" insofar as that is suggested to play into part B of the test. The evidence before this court, therefore, must be examined as to whether the client's location becomes a place of business of Daw's.

Part B of the ABC test in our statute provides: "[S]uch service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed . . . ." General Statutes § 31-222 (a) (1) (B) (ii) (II).

As to part B, the defendant's brief maintains that "the critical inquiry for purposes of [p]art B of the ABC test is whether [Daw's] provides nurses' services at medical facilities." This, the defendant claims, depends upon the relationship between Daw's payment to the nurses and the facilities' payments to Daw's. The defendant also claims that "the independence of [Daw's] payment of nurses for their services and facilities' payments to [Daw's] for those services is dispositive because it establishes [Daw's] economic dependence on provision of nurses' services at facilities and absence of a conduit for facilities' payments to the nurses." The payment arrangements are dispositive because, the defendant continues, the statutory language of part B focuses on the "general nature of a business in terms of simple economic reality rather than the complex inquiry into the right of control required by [p]art A." Daw's disagrees with such claims.

Connecticut authority as to part B analysis is "limited" as noted in *Feshler* v. *Hartford Dialysis,* Administrator, Employment Security Appeals Division, Board of Review, Case No. 995-BR-88 (December 27, 1988). The Supreme Court in *Latimer* did not discuss part B (or part C) in its opinion. Interestingly, although the trial court in *Latimer* disposed of that case under part B with a limited analysis, the Supreme Court affirmed by resting its opinion entirely on part A. *F.A.S. International* had no need to discuss part B as the defendant administrator in *F.A.S. International* conceded that part B was satisfied. In *Hartford Dialysis,* a board of review case under the act, upon

which the defendant places great stress, found that the appellant there had not demonstrated nonliability under part B. That case is distinguishable also from this court's part B analysis because the dialysis services in *Hartford Dialysis,* were performed in only one place, Hartford Hospital. In that case Hartford Hospital had to be the place of business because that was where the service was performed and all the nurses involved performed their services at that premises and at no other place.

Other court decisions, however, provide some guidance for part B analysis. Where an "employer" is in the business of supplying medical facilities with nurses on a temporary basis and those nurses do not work in the "employer's" office but at client medical facilities, that "employer's" business is brokering nursing personnel to such facilities and satisfies part B of the ABC test. *Trauma Nurses, Inc.* v. *Board of Review,* supra, 147–48. Where adjunct faculty taught courses in localities away from the college's offices, such localities were considered the college's places of business as the college was in the business of educating students. *Vermont Institute of Community Involvement, Inc.* v. *Department of Employment Security,* 140 Vt. 94, 436 A.2d 765 (1981).

Daw's argues that it, in effect, brokers nursing personnel. A "broker" has been said generally to be one whose business it is to bring buyer and seller together. See *Philadelphia Tax Review Board* v. *Toben,* 32 Pa. Commw. 537, 379 A.2d 1361, 1365 (1977). A "broker" has also been said to be a "middleman or negotiator between parties." Black's Law Dictionary (6th Ed.). There can be little question that Daw's is in the business of providing, indeed brokering, nurses to its clients' medical facilities. There is also little question that the nurses so provided furnished their professional services at the particular medical facility. Once, however, they went on assignments, Daw's had

no control over them, certainly as to how they performed their services. Daw's made no on-site inspection of the nurses' performance. Daw's was not in the business of *providing* health care at any client's medical facility. In other words the business of providing health care personnel does not translate into the business of caring for patients. *Trauma Nurses, Inc.* v. *Board of Review,* supra, 147. As in *Trauma Nurses,* the "simple and overriding fact" is that Daw's does not perform patient care but it brokers nurses. In so doing it is the nurses who perform nursing services when at medical facilities, which is a function beyond the usual course of the business of Daw's and beyond what, in fact, it holds itself out to do.

Moreover, the words "of the enterprise" in part B do not change this because the "enterprise" in which Daw's is engaged is providing nurses to medical facilities and no more. To say, as the defendant suggests, that because Daw's is in a business the nature of which cannot take place on its own premises, but only in medical facilities, and that the latter locations must necessarily be within the "enterprise" and are thus subsumed within "place of business" as the court did in *State Department of Labor* v. *Medical Placement Services, Inc.,* 457 A.2d 382 (Del. Super. 1982), is wide of the mark for at least two reasons. First, it misconceives what Daw's does and all it does—furnish nurses. Second, under such reasoning there would be little, if any, need for part B to be an element of an exemption which the legislature expressly included in this statute, proving that the legislature contemplated that there are those who might demonstrate entitlement to such an exemption. Daw's obtains the moneys by which it pays the nurses and itself from moneys paid to it by medical facilities for the services of its nurses. Daw's is actually only a conduit for payment of the nurses by the particular medical facilities involved. This court, thus, rejects the defendant's claim that the method of payment is dis-

positive of part B. The Vermont Supreme Court, in finding an employer-employee relationship, pointed out that expressed intention (where the employment agreement declared that the relationship was not one of employer-employee but one of independent contractor) should not be preferred over the reality of the situation so as to defeat the broad purpose of the unemployment compensation statute. *Burchesky* v. *Department of Employment & Training,* supra. Nevertheless, that court went on to say that "[o]n the other hand, the 'ABC test' does not hamper those who undertake to do business together as independent contracting parties, rather than as employer and employee." Id., 361. Nor should it hamper here where Daw's has demonstrated that it has satisfied part B. Part B has been satisfied by Daw's, and the defendant's conclusion to the contrary cannot stand.

### III

Part C of the ABC test under § 31-222 (a) (1) (B) (ii) (III) provides that "such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . ."

Again the factual findings of the report are not based on any evidence that was heard or introduced at a "hearing," which has been defined above. Consequently, for support the court must again look, as earlier, to such things as pretrial discovery including the answers to the requests to admit, the stipulations, and the evidence adduced at the trial. It seems to this court that the first statement under the report's part C analysis is quite conclusory and merely adds up to saying that Daw's was "in error" in issuing 1099s because its nurses were employees from whose wages Daw's should have withheld taxes and issued W-2s. Likewise, the statement that the nurses of Daw's working for

other agencies would be employees of such agencies has no basis in fact when the report was written and is also conclusory. To say, without evidence, that nurses lose their "independent status" when employed by a temporary agency is again stating a conclusion not based on fact. The balance of the statements in that report under part C stand on a somewhat different footing. Here we refer to the statements that the nurses are paid on an hourly basis and are not at risk for profit or loss, that Daw's would pay the nurses whether the client medical facility paid Daw's, and that the client medical facilities are doing business with Daw's for the purpose of obtaining the services of temporary employees. Again, while the defendant held no hearing and took no evidence, this court can say, considering everything before it, that these three statements can be found to be true as factual matters. The report's analysis, however, does not permit its conclusion that Daw's does not come within part C of the ABC test. It, therefore, becomes necessary to determine on all the evidence before this court whether that is so.

One aspect of the defendant's position that is of concern to this court must be addressed. The defendant argues that "unlike [p]arts A and B of the ABC test, which focus on the individual's relationship to the alleged employer, [p]art C focuses precisely on the individual's activities independent of the alleged employer." The defendant then claims that "while an individual's testimony might be relevant to an alleged employer's general business practices applicable to the group for purposes of [p]arts A and B, testimony of an individual's own independent activities is irrelevant to another individual's independent activity." The defendant's argument here comes down to this: because each individual's independent activities for purposes of part C can be so different, then Daw's has clearly not met the burden of proof in part C as to all those nurses work-

ing for it between 1985 and 1987, who did not testify in court in these cases. On the one hand, six nurses of Daw's testified in court in addition to Karen Whyko, the president of Daw's. On the other hand, the parties stipulated in writing that Daw's paid 211 nurses in 1985, 254 in 1986 and 273 in 1987. It is not quite fair for the defendant to claim as it now does—certainly as to all those nurses who did not testify—that Daw's has not carried its burden as to part C. While this court does not have a transcript of the trial, its recollection is that the defendant took the position that Daw's did not have to put every nurse on the witness stand to determine her status. Moreover, the defendant's present position was not the theory upon which Daw's presented the cases and the defendant defended the present cases. Further, the defendant made no motion at the end of the trial that would serve to alert the court or opposing counsel to this matter. Finally, the court believed from what was apparent to it through the end of the trial that it could rely on all the evidence in determining throughout the status of the persons involved who were similarly situated insofar as the act tax liability of Daw's for all its nurses was involved. The court says "similarly situated" because that was the clear impression it received. It would be facile to say that the defendant apparently had no problem finding all the nurses similarly situated when it issued its assessments covering all of them in the first instance. It prefers, however, to take the position that it must find against Daw's as to part C as to its present claim of the failure of Daw's to sustain its burden as to all nurses not testifying. Accordingly, the court rejects this claim of the defendant and will rest its resolution of the part C issue on the law and the evidence as applied to all the nurses regardless of whether they testified.

Before going into an analysis, the court first examines the statute closely as to part C. The court notes that the adverb "independently" modifies the word "established" and in that context, fairly construed, means that the trade, occupation, profession or business was established independently of the "employer" (Daw's). See, e.g., *Vermont Securities, Inc.* v. *Vermont Unemployment Compensation Commission,* 118 Vt. 196, 201, 104 A.2d 915 (1954). Moreover, such "independently established activity" must be one in which the "employee" is "customarily engaged." "Customarily" has been said to mean "usually, habitually, regularly." See, e.g., *South Dakota Department of Labor* v. *Tri State Insulation Co.,* 315 N.W.2d 315, 316 (S.D. 1982); *Fuller Brush Co.* v. *Industrial Commission,* 99 Utah 97, 102, 104 P.2d 201 (1940). The use of "is," the present tense, shows that the "employee" must be engaged in such independently established activity at the time of rendering the service which is the subject of inquiry. An established business has been said to be one that is "permanent, fixed, stable, or lasting." *Unemployment Compensation Commission* v. *Collins,* 182 Va. 426, 437, 29 S.E.2d 388 (1944); *Vermont Securities, Inc.* v. *Vermont Unemployment Compensation Commission,* supra. In speaking to the language "customarily engaged in an independently established profession," our Supreme Court has said that "[t]his requires one or more enterprises created by [the artists, writers, photographers employed by the plaintiff F.A.S.] which exist separate and apart from their relationships with [their employer] F.A.S. and which will survive the termination of that relationship. The performance of like services by the [F.A.S.] artists, writers and photographers must be independent of whatever connection they have with F.A.S. [their employer] and their continued performance of such

like services must not be subject to their relationship with the principal [F.A.S.]." *F.A.S. International, Inc.* v. *Reilly,* supra, 515.

Applying these principles, the court examines the evidence to determine whether Daw's has sustained its burden of proof as to part C. The nurses were "customarily engaged in an independently established . . . profession." Here the court notes that part C in our statute refers to "an independently established trade, occupation, profession or business . . . ." These four terms are in the disjunctive. The nurses were in a "profession." The term "profession" implies "knowledge of an advanced type in a given field of science or learning gained by a prolonged course of specialized instruction and study." *People ex rel. Tower* v. *State Tax Commission,* 282 N.Y. 407, 412, 26 N.E. 955, 13 N.Y.S.2d 727 (1940). The nurses were in an independently established profession as the result of having been licensed by the state after completing a long course of such instruction and study. In Connecticut the board of examiners for nursing has jurisdiction by statute to hear all charges of conduct which fails "to conform to the accepted standards of the nursing *profession,*" and it has such jurisdiction as to registered nurses and licensed practical nurses. (Emphasis added.) General Statutes § 20-99 (a). They were also "customarily" so engaged in that profession as defined. This calling is "independently established." It exists separate and apart from their relationships with Daw's and it will survive the termination of their relationship with Daw's. *F.A.S. International, Inc.* v. *Reilly,* supra. According to Whyko, well over a majority of the nurses worked for other agencies at other medical facilities performing similar services while also working on assignments through Daw's.[11] The performance of such

---

[11] *Feshler* v. *Hartford Dialysis,* Administrator, Employment Security Appeals Division, Board of Review, Case No. 995-BR-88 (December 27, 1988), states that the dialysis nurses, though permitted to perform their services for other

"like services" was independent of "whatever connection" they had with Daw's and the continued performance of such "like services" was "not subject to their relationship with the principal [Daw's]." *F.A.S. International, Inc.* v. *Reilly,* supra. The independently established nature of their nursing profession permits them to continue therein even after their relationship with Daw's terminates.

The defendant makes much use of the terms "enterprise" and "business" in arguing on part C. It seizes upon the term "enterprises" as used in *F.A.S. International, Inc.* v. *Reilly,* supra, where the court states that the " 'customarily engaged . . . profession' " language of part C "requires one or more enterprises [to be] created . . . which will survive the termination of [their] relationship [with F.A.S.]." This, the defendant claims, requires an individual's own business rather than a mere license to conduct business, indicating that any doubt that the independent business requirement "extends to professionals under the statutory reference to 'an independently established profession' " is removed by the Supreme Court's reference in *F.A.S. International* to require *enterprises* created by the individuals—in *F.A.S. International* the professional artists, writers and photographers and in the present case the nurses. The court does not agree as much of what was just said in the analysis under part C applies to this claim of the defendant. The terms "enterprise" and "business" as used by the defendant,

---

entities than Hartford Dialysis, "do not customarily do so" and "are not customarily engaged in an independently established business or profession of the same nature." Continuing its part C analysis, *Hartford Dialysis* points out that most of the nurses there, approximately thirty in number, were trained by Hartford Dialysis and "have worked almost exclusively for Hartford Dialysis since they were trained." In that case the opinion speaks of a "suggestion" that other of its nurses "might have worked for [other] facilities . . . no details are contained in the record." Id. Such factual circumstances serve to distinguish Hartford Dialysis from Daw's on part C analysis.

however, do not alter that analysis. It is reasonably arguable that the terms "trade, occupation, profession *or* business" used in part C comprehensively subsume the spectrum of services capable of being rendered by a person, individual or corporation. The court has chosen to regard nursing as a "profession" for the reasons already given to which it can also be added that the statutory scheme also appears to refer to it similarly. See, e.g., General Statutes § 20-99 (a) and (b).

The court does not agree that *F.A.S. International* "required" the individuals there involved to have an "independently established business" in the sense that the defendant suggests that term be used. The defendant claims here that the nurses were required, in effect, to have a saleable business before they could be considered customarily engaged in an independently established profession. There the defendant argues that the statute as well as *F.A.S. International* so requires. This court submits that our statute does not impose such a requirement; the defendant points to no language tending to such a construction. In that regard this court is mindful that even where there is a legislative mandate to apply a liberal interpretation to a statute, that still does not justify judicial creation of rights or liabilities under the guise of construction. See, e.g., *Rines* v. *Scott,* 432 A.2d 767, 769 (Me. 1981); 3 J. Sutherland, Statutory Construction (5th Ed. Singer 1992) § 58.05.

Coming back to the defendant's stress on "enterprises" as used in *F.A.S. International,* the court agrees with Daw's that even though the artists, writers and photographers in *F.A.S. International* did not have saleable businesses created by them, they were, nonetheless, considered to have created "enterprises" separate and apart from this relationship with F.A.S. An examination of *F.A.S. International* particularly as to its use of "enterprises" is to be done in the light of the facts under discussion there. See *Armour & Co.* v.

*Wantock,* 323 U.S. 126, 132–33, 65 S. Ct. 165, 89 L. Ed. 118 (1944). A fair reading of *F.A.S. International* is that the performance of "like services" by the F.A.S. performers existed "separate and apart from their relationships with F.A.S." and that relationship would survive the termination of their relationship with F.A.S. as those were considered "enterprises" as *F.A.S. International* employs that term. Such a reading when applied to the nurses here supports the view that they too can be considered to have created "enterprises" in the *F.A.S. International* sense. Keeping in mind the remedial nature of our act and specifically part C, this court can say that under the facts of the present case the nurses are not at the economic risk of unemployment by the conduct of Daw's. These nurses are customarily engaged in an independently established profession that constitutes a means of livelihood quite apart from their relationship with Daw's. This court concludes, while extending the required deference, that the defendant's conclusion as to part C cannot stand and that Daw's has sustained its burden of proof of satisfying part C of the ABC test.

## IV

The act is remedial legislation and, as such is " 'to be construed liberally as regards beneficiaries . . . to accomplish its purpose,' " which is " 'to ameliorate the tragic consequences of unemployment.' " *Reger* v. *Administrator,* 132 Conn. 647, 650, 46 A.2d 844 (1946); see *Robert C. Buell & Co.* v. *Danaher,* supra, 612. A cardinal rule of statutory construction is that statutes are to be construed to give effect to the apparent intention of the law making body. *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 434 A.2d 293 (1980). Another such rule is that the legislature is presumed to have had meaning as to every word it used in enacting a statute. The

present case is not like *Burnham* v. *Administrator,* supra, 324, where the trial court was asked to imply an exception despite the categorical language of the statute. The present case is one where there is express language of exception within which the court finds the plaintiff has proven that it falls. In *F.A.S. International,* where it held that the artists, writers and photographers had satisfied the ABC test, the court went right on thereafter to say that "[i]n *Halabi* v. *Administrator,* 171 Conn. 316, 322, 370 A.2d 938 (1976), however, decided after the ABC test was included in the statute, the court stated that although the Unemployment Compensation Act should be construed liberally in favor of beneficiaries in order to effectuate its purpose, it should not be construed unrealistically in order to distort its purpose. See also *Furber* v. *Administrator,* 164 Conn. 446, 454, 324 A.2d 254 (1973)." *F.A.S. International, Inc.* v. *Reilly,* supra, 516.

Under all the circumstances this court concludes, even after extending the deference to be accorded the decision of the defendant, that both appeals must be sustained. This determination does not involve the substitution of the court's judgment for that of the defendant, but is required where it has been proven that the "administrator's conclusion, assessing contributions against the plaintiff, was unreasonable, arbitrary or illegal." *Latimer* v. *Administrator,* supra, 245 n.9; see *Burnham* v. *Administrator,* supra, 322; *F.A.S. International, Inc.* v. *Reilly,* supra, 507. It is pointed out that these appeals cannot be concluded, as the defendant seems to suggest, to be "doubtful cases" as that term is set out in General Statutes § 31-274 (c).

This court concludes that, under the circumstances, sustaining the appeals in each of these two cases does not hamper the purposes of the act where, as here,

Daw's demonstrates that the defendant was in error in holding that each prong of the ABC test had not been satisfied.

Accordingly, judgment may enter sustaining the appeals of Daw's in both cases.