******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

ROGERS, C. J., with whom PALMER and McDON-ALD, Js., join, dissenting. I respectfully dissent from the majority opinion because I believe that its interpretation of the test set forth in General Statutes § 31-222 (a) (1) (B) (ii) for determining whether an employer-employee relationship existed (ABC test) effectively rewrites that test and fails to give one part of it the full significance that clearly is required. In so doing, the majority lowers the high, legislatively set bar that an enterprise must surmount in order to avoid making contributions to the state's unemployment compensation fund (fund) pursuant to General Statutes § 31-225.

More particularly, I disagree with the majority's determination that the trial court and the Employment Security Appeals Division, Board of Review (board), improperly concluded that the plaintiff, Standard Oil of Connecticut, Inc., was required to make contributions to the fund because it failed to prove all three parts of the ABC test as is necessary for a putative employer to be exempt from such contributions. My review of the record and the applicable law, considered with reference to the remedial purpose of the Unemployment Compensation Act (act); General Statutes § 31-222 et seq.; leads me to conclude that the plaintiff clearly failed to prove either subpart of part B of that test. See General Statutes § 31-222 (a) (1) (B) (ii) (II). Because the failure to prove any part of the ABC test is dispositive, I do not reach the question of whether the plaintiff also failed to prove part A of the test.[1]

The defendant, the administrator of the act, determined, and the board and trial court agreed, that the relationship between the plaintiff and the technicians and installers at issue was one of employment, as contemplated by § 31-222 (a) (1), thereby making the plaintiff liable for contributions to the fund pursuant to the act. Our review of that determination is largely deferential. In regard to factual findings, "[r]eview of an administrative agency decision requires a court to determine whether there is substantial evidence in the administrative record to support the agency's findings of basic fact and whether the conclusions drawn from those facts are reasonable. . . . Neither this court nor the trial court may retry the case or substitute its own judgment for that of the administrative agency on the weight of the evidence or questions of fact." (Internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, 265 Conn. 413, 417, 828 A.2d 609 (2003). Rather, "[a]n agency's factual and discretionary determinations are to be accorded considerable weight by the courts."[2] (Internal quotation marks omitted.) Id., 417–18.

At the same time, however, if "the issue is one of law, the court has the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion." (Internal quotation marks omitted.) *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, 238 Conn. 273, 276, 679 A.2d 347 (1996).

The present matter requires an interpretation of § 31-222 (a) (1) (B) (ii) (II), part B of the ABC test, which has not been subject to much judicial or agency examination. In regard to issues of statutory construction, "[g]enerally, [o]ur review of an agency's decision on questions of law is limited by the traditional deference that we have accorded to that agency's interpretation of the acts it is charged with enforcing." (Internal quotation marks omitted.) *Church Homes, Inc.* v. *Administrator, Unemployment Compensation Act*, 250 Conn. 297, 303, 735 A.2d 805 (1999). Nevertheless, "[i]t is well settled . . . that we do not defer to the board's construction of a statute—a question of law—when, as in the present case, the [provision] at issue previously ha[s] not been subjected to judicial scrutiny or when the board's interpretation has not been time tested." (Internal quotation marks omitted.) *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, supra, 265 Conn. 418. In such a case, our review of the interpretation of that provision is plenary. Id.

It is well established that the act is remedial legislation that was intended "to protect those who are at risk of unemployment [and its tragic consequences] if their relationship with a particular employer is terminated"; id., 420; see also *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, 42 Conn. Supp. 376, 411, 622 A.2d 622 (1992), aff'd, 225 Conn. 99, 622 A.2d 518 (1993); and, therefore, that the act should be liberally construed in favor of those whom it is intended to benefit. *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 411. The legislature expressly has mandated that the act "be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases." General Statutes § 31-274 (c).

Pursuant to the act, the existence of an employment relationship triggers the responsibility of employers to make contributions that fund unemployment benefits. The act "defines employment in . . . § 31-222 (a) (1). In addition to codifying the common-law rules applicable to determine the existence of an employer-employee relationship, the act was amended in 1971 to include

the so-called 'ABC test,' now set forth in [subparts] I, II and III of § 31-222 (a) (1) (B) (ii)." *F.A.S. International, Inc.* v. *Reilly*, 179 Conn. 507, 511, 427 A.2d 392 (1980); see also Public Acts 1971, No. 835, §§ 1 through 3. Because the ABC test defines employment more broadly than the common law, in Connecticut and other jurisdictions using that test, "service may be employment and one may be an employee [for purposes of the act] even if the common-law relationship of master and servant does not exist . . . ." Id.; see also *L.A. McMahon Building Maintenance, Inc.* v. *Dept. of Employment Security*, 32 N.E.3d 131, 141 (Ill. App. 2015); *Athol Daily News* v. *Board of Review of the Division of Employment & Training*, 439 Mass. 171, 177 n.10, 786 N.E.2d 365 (2003); *Fleeman* v. *Nebraska Pork Partners*, Docket No. S-08-0476, 2009 WL 6964983, *4 (Neb. January 22, 2009); *Fleece on Earth* v. *Dept. of Employment & Training*, 181 Vt. 458, 463, 923 A.2d 594 (2007).[3]

A business enterprise claiming exemption from payment of unemployment taxes pursuant to the ABC test has the burden of proving that it comes within that statutory exemption, which must be strictly construed. *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 389. "In order to demonstrate that [it] is not an employer and therefore has no liability for unemployment taxes under the act, a recipient of services must show that [it] has satisfied the criteria necessary to establish nonliability under all three prongs of the ABC test. . . . The test is conjunctive; all parts must be satisfied to exclude [a recipient of services] from the [a]ct." (Citations omitted; internal quotation marks omitted.) *Latimer* v. *Administrator, Unemployment Compensation Act*, 216 Conn. 237, 246–47, 579 A.2d 497 (1990). Stated otherwise, an enterprise's failure to establish any single part of the test is dispositive, and necessarily will result in a determination that the relationship at issue is one of employment.

Pursuant to the ABC test, an individual will *not* be considered an employee of an enterprise if the enterprise can prove that, "[A] such individual has been and will continue to be free from control and direction in connection with the performance of such service, both under his contract for the performance of service and in fact; *and* [B] such service is performed either outside the usual course of the business for which the service is performed or is performed outside of all the places of business of the enterprise for which the service is performed; *and* [C] such individual is customarily engaged in an independently established trade, occupation, profession or business of the same nature as that involved in the service performed . . . . General Statutes § 31-222 (a) (1) (B) (ii) (I) (II) and (III)." (Emphasis in original; internal quotation marks omitted.) *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, supra, 238 Conn. 277–78.

Part B of the ABC test is stated in the disjunctive. Consequently, an enterprise such as the plaintiff may satisfy part B by establishing *either* that the workers at issue performed services outside of the usual course of the enterprise's business, *or* that they performed services outside of all of the enterprise's places of business. See General Statutes § 31-222 (a) (1) (B) (ii) (II). In my view, the board and the trial court correctly concluded that the plaintiff had failed to satisfy either of these alternatives.

In regard to the first subpart of part B, to decide whether the work at issue was within an enterprise's "usual course of business," a court should examine the specific business activities in which the enterprise engages and determine which of those activities are performed "on a regular or continuous basis." Id., 279–80. If the activities performed by the workers at issue are "not performed [by the enterprise] on a regular or continuous basis, then the [enterprise] has satisfied [subpart one of part] B [by showing that] the activit[ies] [are] 'outside the usual course of the business' of the enterprise." Id., 280. An activity need not comprise the majority of an enterprise's business or its primary line of work in order to be within the enterprise's usual course of business, as long as it is performed with the requisite frequency. Thus, when an activity is undertaken by an enterprise "as an isolated instance," the activity will not be held to be within the enterprise's " 'usual course of business,' " but when the enterprise engages in that activity "as a regular or continuous practice, the activity will constitute part of the enterprise's usual course of business irrespective of its substantiality in relation to the other activities engaged in by the enterprise." Id.

In determining what activities comprise an enterprise's usual course of business, a court should consider evidence of the actual conduct of the enterprise, as well as various indicators of what that enterprise holds itself out to the public to be. Such indicators may include the statements of the enterprise's owners or principals, as well as the enterprise's official business documents or promotional materials. See id., 282 (brochures offering art classes were evidence that classes were part of museum's usual course of business); *New Haven Country Club Corp.* v. *Administrator, Unemployment Compensation Act*, Superior Court, judicial district of New Haven, Docket No. CV-970404924-S (September 17, 1999) (golf equipment imagery on insignia and golf course map on restaurant menu were evidence that golf was part of country club's usual course of business); *Jori Enterprises, LLC* v. *Director, Dept. of Workforce Services*, 2015 Ark. App. 634, 474 S.W.3d 910, 914 (2015) (statements on website were evidence that in-home tutoring was company's normal course of business); *McPherson Timberlands, Inc.* v. *Unemployment Ins.*

*Commission*, 714 A.2d 818, 819 (Me. 1998) (advertisements and contracts with landowners were evidence that timber harvesting was part of timber management and marketing company's usual course of business); *Appeal of Niadni, Inc.*, 166 N.H. 256, 257–58, 93 A.3d 728 (2014) (print and online advertisements were evidence that live entertainment was part of resort's usual course of business); *Bros. Construction Co.* v. *Employment Commission*, 26 Va. App. 286, 290–91, 494 S.E.2d 478 (1998) (company president's testimony was evidence that siding installation was part of usual course of business of company that installed siding, gutters and downspouts on residential and other buildings); but see *Carpetland, USA, Inc.* v. *Dept. of Employment Security*, 201 Ill. 2d 351, 355–56, 776 N.E.2d 166 (2002) (carpet installation not part of carpet seller's usual course of business where seller expressly limited its business to sales, making clear in sales agreements that installation with subcontractor needed to be arranged separately). In short, "a purported employer's own definition of its business is indicative of the usual course of that business." *Sebago* v. *Boston Cab Dispatch, Inc.*, 471 Mass. 321, 333, 28 N.E.3d 1139 (2015).

In *Mattatuck Museum-Mattatuck Historical Society* v. *Administrator, Unemployment Compensation Act*, supra, 238 Conn. 282, we concluded that instructors retained to teach art courses at an art museum were employees of the museum for purposes of the act because those art courses were part of the museum's " 'usual course of business,' " even though the museum "operate[d] largely as an exhibition hall for regional historic artifacts and art." Id., 274. The museum had utilized instructors to teach art courses for several years. Id., 282. Moreover, it had held itself out to the public as offering such courses by "distribut[ing] brochures announcing the courses, class hours, location, registration fees, and the instructors' names." Id. From those materials, "the general public could infer that the art courses were a regular part of the [museum's] business." Id.

In the present matter, it is not disputed that about 10 percent of the plaintiff's business is devoted to the installation, service and repair of heating and cooling equipment and security systems,[4] and that these services have been performed routinely on an ongoing basis. As the board's decision explains: "[T]he [plaintiff] is an oil company which advertises and sells heating and cooling equipment and security systems. The vast majority of the heating and cooling equipment and security systems sold by the [plaintiff] are installed by the installers [at issue] on behalf of the [plaintiff]. The [plaintiff] specifically advertises the sale of *installed* heating and cooling equipment and security systems, and it contracts directly with its customers regarding that installation. The [plaintiff's] vice president, David Cohen, testified that the [plaintiff] sells security systems

and heating and cooling equipment in the normal course of its business, and that it typically sells installation along with the equipment. Cohen testified that only 'rarely' will the [plaintiff] sell a security system or heating and cooling equipment and not sell the installation." (Emphasis in original.) The board also found that "the [plaintiff] has employees [on payroll] who clean and service its heating and cooling equipment, in addition to the [contract] technicians . . . ."[5]

In light of the foregoing, I can find no fault with the board's conclusion that the weight of the evidence compelled a conclusion that the services performed by the installers and technicians at issue were not outside the usual course of the plaintiff's business. The plaintiff did not provide the services at issue in isolated instances, but rather, did so on a regular and continuous basis. It is of no moment that the work comprised a minority of the plaintiff's business activities overall. The plaintiff, through its public facing advertisements and dealings with its customers, held itself out as a seller *and* installer of heating and cooling equipment and security systems. Cohen, the plaintiff's vice president, essentially conceded that equipment installation services were part and parcel of the plaintiff's offerings. The presence of technicians on the plaintiff's payroll demonstrates further that service work is regularly performed by the plaintiff. I readily conclude, therefore, that the plaintiff failed to prove that subpart one of part B of the ABC test was satisfied as to both the installers and the technicians at issue.[6]

I turn next to the second subpart of part B of the ABC test, namely, whether the services at issue are "performed outside of all the places of business of the enterprise for which the service is performed . . . ." General Statutes § 31-222 (a) (1) (B) (ii) (II). Because it is beyond dispute that the plaintiff failed to prove subpart one of part B, it was crucial for it to prove subpart two to avoid liability for contributions to the fund pursuant to the act.

Hewing closely to the remedial purpose of unemployment compensation statutes and the concomitant requirement that they be construed liberally to effectuate their purpose, many courts have concluded that the phrase "places of business" encompasses not just the office space or other premises that are an enterprise's base of operations, but also customer locations or other remote sites where the enterprise carries on a major portion of its business activities. Specifically, the phrase "places of business" has been construed to include: parcels of land owned by third parties, for harvesters of timber; *Clayton* v. *State*, 598 P.2d 84, 86 (Alaska 1979); *McPherson Timberlands, Inc.* v. *Unemployment Ins. Commission*, supra, 714 A.2d 823; *Miller* v. *Employment Security Dept.*, 3 Wn. App. 503, 506, 476 P.2d 138 (1970); roadways, for a transporter of large

vehicles; *Mamo Transportation, Inc.* v. *Williams*, 375 Ark. 97, 103, 289 S.W.3d 79 (2008); a messenger service; *Chicago Messenger Service* v. *Jordan*, 356 Ill. App. 3d 101, 116, 825 N.E.2d 315 (2005); a vehicle repossessor; *Midwest Property Recovery, Inc.* v. *Job Service of North Dakota*, 475 N.W.2d 918, 924 (N.D. 1991); and a taxicab business;[7] *Employment Security Commission* v. *Laramie Cabs, Inc.*, 700 P.2d 399, 407 (Wyo. 1985); hotel meeting rooms, for a real estate association providing continuing education to its members; *Missouri Assn. of Realtors* v. *Division of Employment Security*, 761 S.W.2d 660, 664 (Mo. App. 1988); remote class sites, for a decentralized academic institution; *Vermont Institute of Community Involvement, Inc.* v. *Dept. of Employment Security*, 140 Vt. 94, 99, 436 A.2d 765 (1981); and customer homes, for providers of home health-care services; *Home Care Professionals of Arkansas, Inc.* v. *Williams*, 95 Ark. App. 194, 199, 235 S.W.3d 536 (2006); in-home tutoring services; *Jori Enterprises, LLC* v. *Director, Dept. of Workforce Services*, supra, 474 S.W.3d 914; cable television installation services; *TNT Cable Contractors, Inc.* v. *Director, Dept. of Workforce Services*, 2015 Ark. App. 79, *5, 2015 WL 590249 (2015); window washing services; *L.A. McMahon Building Maintenance, Inc.* v. *Dept. of Employment Security*, supra, 32 N.E.3d 143; carpet measuring services; *Carpetland U.S.A., Inc.* v. *Dept. of Employment Security*, supra, 201 Ill. 2d 391;[8] and siding installation services. *Brothers Construction Co.* v. *Employment Commission*, supra, 26 Va. App. 297.[9]

These decisions appear to recognize that there is nothing inherent in work carried on in disbursed locations that renders those who perform it less subject to unemployment, and the hardships that it causes, than those who work in fixed locations maintained by their employers. In determining that the locations at issue were the enterprises' places of business, the courts have invoked such considerations as: whether, realistically, the services offered by the enterprise were performed at the location in question; see *Mamo Transportation, Inc.* v. *Williams*, supra, 375 Ark. 103 (summarizing cases); whether workers regularly represent the enterprise's business interests at the location in question; see *Carpetland U.S.A., Inc.* v. *Dept. of Employment Security*, supra, 201 Ill. 2d 391; whether the enterprise has a significant and business related presence at the location in question; *McPherson Timberlands, Inc.* v. *Unemployment Ins. Commission*, supra, 714 A.2d 822–23; whether the enterprise has contracted with the owner of the premises at issue to perform work there; see *Clayton* v. *State*, supra, 598 P.2d 86; *McPherson Timberlands, Inc.* v. *Unemployment Ins. Commission*, supra, 823; and whether the very nature of the business activities in question dictated that they be performed in places outside the enterprise's own physical premises. See *L.A. McMahon Building Maintenance, Inc.* v.

*Dept. of Employment Security*, supra, 32 N.E.2d 143; compare *O'Dell* v. *Director, Dept. of Workforce Services*, 2014 Ark. App. 504, 442 S.W.3d 897, 900 (2014) (where medical note transcriptionists could have performed transcription services at enterprise's business office, but instead did work wherever they chose, work sites were not enterprise's places of business).

Another line of cases makes clear that, where an enterprise itself does not provide a service, but rather, acts as a broker or referrer of individuals who will provide that service, the places where the service is performed are not "places of business" of the brokering or referring enterprise. See, e.g., *JSF Promotions, Inc.* v. *Administrator, Unemployment Compensation Act*, Superior Court, judicial district of Hartford, Docket No. CV-97-0575801 (April 3, 2002) (31 Conn. L. Rptr. 715, 719) (where enterprise's business was to serve as broker or intermediary between manufacturers and sellers to provide product demonstrators, supermarkets where demonstrators worked were not enterprise's places of business), rev'd on other grounds, 265 Conn. 413, 828 A.2d 609 (2003); *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 402–403 (where enterprise's business was brokering nursing services, rather than performing patient care, medical facilities where nurses worked were not enterprise's places of business); *Dept. of Employment, Training & Rehabilitation* v. *Reliable Health Care Services of Southern Nevada, Inc.*, 115 Nev. 253, 259–60, 983 P.2d 414 (1999) (where enterprise's business was brokering health-care workers, sole place of business was its administrative office); *Koza* v. *Dept. of Labor*, 282 N.J. Super. 560, 563–64, 660 A.2d 1231 (1995) (where musician acted essentially as agent to assemble various groups to play shows, sites of performances were not his places of business).

In regard to the second subpart of part B, the board found as follows: "The [plaintiff] contracts directly with its customers to provide installation of its heating and cooling equipment and security systems in the customers' homes, and to continue to service the equipment and monitor the security systems. . . . [Accordingly, those] homes have, by contract, become places of business of the [plaintiff] . . . . [Moreover] the installers and technicians represent the [plaintiff's] interest when they are in the homes of the [plaintiff's] customers, and the [plaintiff] profits from the services that are performed in its customers' homes. . . . [Additionally] the [plaintiff] does not merely broker contractor services but, rather, offers installation and servicing of heating and cooling equipment and security systems to the public." The board also noted that the plaintiff rarely sold equipment without also selling its installation, and that the plaintiff had "long-term contracts with its customers to service its heating and cooling equipment and monitor its security systems."

I agree with the board's conclusion that, consistent with the law outlined herein, the customers' homes were the plaintiff's "places of business" as contemplated by subpart two of part B of the ABC test. As is clear from the evidence discussed in my analysis of subpart one of part B, the plaintiff was not merely a broker of installation and repair services, but rather, a direct provider of such services. By their very nature, these services needed to be provided in customers' homes and could not occur at the plaintiff's physical plant. The plaintiff contracted directly with the homeowners for installation and ongoing services, thereby authorizing the plaintiff to have a significant, business related presence in the customers' homes. By installing the equipment that the plaintiff had sold to its customers, specifically on an installed basis, the installers represented and furthered the plaintiff's business interests. So too did the technicians, when they serviced and repaired the equipment. Thus, both the installers and the technicians supported the plaintiff's ongoing business relationships with the customers through their work in the homes. As the trial court explained, "[t]he plaintiff engages the [installers and the technicians] to perform certain tasks as part of a continuing provision of services at the customers' locations." For these reasons, I too, like the board and the trial court, conclude that the installers' and technicians' services were not performed outside of all of the plaintiff's places of business so as to satisfy subpart two of part B of the ABC test. Furthermore, because the plaintiff also failed to satisfy subpart one, part B in its entirety was unmet, thereby establishing that the technicians and installers were employees of the plaintiff for purposes of the act.

The majority appears to find insufficient guidance in the case law applying subpart two of part B and, therefore, invokes two general principles to govern the resolution of this case. Those principles are: (1) that related statutes should be construed harmoniously; and (2) the conjunctive nature of the ABC test, "which suggests that no one part of the test should be construed so broadly—and, therefore, made so difficult or impossible to meet—that the other two parts of the test are rendered superfluous." I am not persuaded that these considerations, rather than the most relevant case law from other jurisdictions, should inform our interpretation of subpart two of part B or, in any event, that they compel a different result.

The majority first looks to General Statutes § 31-223 (a), a provision upon which neither the parties, the board nor the trial court have relied in their construction of the ABC test. This subsection, which delineates the boundaries of employers' nonvoluntary liability under the act, dates to the act's inception in 1936; Public Acts 1936, Spec. Sess., November, 1936, c. 2, § 2; and the particular language cited by the majority was part

of a 1939 amendment. Public Acts 1939, c. 310, § 3. Consequently, I am skeptical that § 31-223 (a) provides much insight into the meaning of "places of business" as used in § 31-222 (a) (1) (B) (ii) (II), a provision that was added more than thirty years later to comply with a federal mandate, specifically, by adopting a test using language suggested by the United States Department of Labor. See Public Acts 1971, No. 835, § 1. In short, (1) our legislators did not even craft the ABC test, and (2) their purpose in adopting that test was to meet an extrajurisdictional requirement, and not to provide what they otherwise believed was a necessary supplement to our preexisting state statutory scheme. Under those circumstances, it is simply unrealistic to presume, without question, that § 31-222 (a) (1) (B) (ii) (II) was drafted by our legislature with a keen eye toward creating a harmonious, interlocking body of unemployment compensation laws in Connecticut.

In any event, even accepting the majority's reasoning that "places of business," as used in § 31-222 (a) (1) (B) (ii) (II), necessarily means "premises under [an] employer's control," as used in § 31-223 (a), I still would reach the conclusion that the second subpart of part B of the ABC test is unsatisfied in the present matter. Again, the plaintiff contracts directly with its customers to install equipment in their homes, and to provide various continuing services in those homes thereafter. Accordingly, the customers have authorized the plaintiff, at the time installations and other services are being provided, to enter their homes and exert dominion and control over the premises to the extent it is necessary to provide those services. Even under the majority's construction of "places of business," therefore, the plaintiff failed to prove that the installers and technicians provided services outside of all of the plaintiff's places of business.[10]

Additionally, I disagree that interpreting "places of business" to include, in appropriate cases, customers' homes would make it prohibitively difficult for the plaintiff, or other similarly situated enterprises, to satisfy part B of the ABC test when hiring individuals to work at locations apart from their own central facilities. As I have explained, part B may be satisfied by showing *either* that the services at issue are outside the usual course of an enterprise's business, *or* that they are performed outside of all of the enterprise's places of business. See General Statutes § 31-222 (a) (1) (B) (ii) (II). Accordingly, an enterprise such as the plaintiff can retain individuals to do work in its customers' homes and still satisfy part B if it can show that those individuals are doing work that the enterprise does not regularly and consistently perform. Alternatively, if an enterprise can show that it is a mere broker of the services at issue, the locations where the services are performed will not be deemed the enterprise's places of business. In short, the two subparts of part B work together, and

a court should not, like the majority, view one subpart in isolation.

In the present case, if the plaintiff had established that the services provided by the installers and technicians were not part of the plaintiff's usual course of business, or that it merely was referring customers to third-party workers instead of offering to do the work itself, it would be of no moment that the services were performed inside of the homes of the plaintiff's customers. In this sense, part B operates no differently than it does when all of an enterprise's business activities are performed in a central physical location. If the workers are engaged to perform some service that the enterprise does not typically provide, part B will be satisfied, regardless of the locale of the services.

Finally, to reiterate, the act is a remedial one, and we are bound to interpret it liberally in favor of those it is intended to benefit.[11] *Daw's Critical Care Registry, Inc.* v. *Dept. of Labor*, supra, 42 Conn. Supp. 411; see General Statutes § 31-274 (c). Accordingly, to the extent this case presents a close question, we should decide it in a manner that will result in more, rather than less, coverage for workers who are involuntarily unemployed.[12]

For the foregoing reasons, I respectfully dissent.

[1] In concluding herein that the plaintiff failed to establish that part B of the ABC test was satisfied, I rely on the following factual findings of the board, to which this court must defer:

"1. The [plaintiff] is primarily in the business of home heating oil delivery. It also advertises and sells heating and cooling equipment, and the installation, maintenance and repair of such equipment. For example, the [plaintiff] advertises its twenty-four hour or 'no heat' call service. In addition, the [plaintiff] advertises and sells home security alarm systems, and the installation, maintenance, and monitoring of such systems. The [plaintiff] specifically advertises the sale of *installed* heating and cooling equipment and security systems, and it contracts directly with its customers regarding that installation.

"2. Approximately 90 [percent] of [the plaintiff's] business is generated from its home heating oil delivery service. The remaining [percentage] of the business results from its heating and cooling system installation and repair, home alarm system installation and maintenance and its service work which is routinely part of the service contracts it offers its customers. The [plaintiff] advertises home heating oil delivery, heating and cooling installation, monitoring and maintenance, tank removal, service work and home alarm system installation to its customers and potential customers in the yellow pages.

"3. The [plaintiff] does not own or operate the tools, machinery or heavy duty vehicles required to install heating systems, tank removal or home alarm installation. As a result, it 'contracts' the work to individuals who routinely perform such work either for their own business[es] or self employment. The vast majority of the heating and cooling equipment and security systems sold by the [plaintiff] are installed by the installers on behalf of the [plaintiff]. After installation, the [plaintiff] has long-term arrangements with its customers to service the heating and cooling equipment and to provide monitoring of the security systems. . . .

"16. Installers and technicians generate a percentage of [the plaintiff's] revenues. This portion of [the plaintiff's] business and profitability is dependent on the installation/service work provided by the installers/technicians.

"17. The [plaintiff] sells service contracts to its customers which is central and core to its home heating oil delivery service. While the [plaintiff] maintains a staff of employees to perform such services, it 'contracts' with the technicians to perform the same/similar services to its customers. . . .

"28. The technicians and installers performed all work outside of the

offices of [the plaintiff]." (Emphasis in original.)

The plaintiff filed a motion to correct with the board; see Practice Book § 22-4; in which it requested changes to, inter alia, findings sixteen and seventeen. The board denied those requests and, thereafter, the plaintiff raised a claim in the trial court that that denial was improper. See Practice Book § 22-8 (a). I have reviewed the trial court's decision in this regard and agree with its determination that correction of these findings was unwarranted because the plaintiff did not prove that the standard of Practice Book § 22-9 (b) had been satisfied.

[2] I disagree with the plaintiff's additional claim on appeal that, due to the plaintiff's filing of a motion to correct pursuant to Practice Book § 22-4; see footnote 1 of this opinion; a less deferential standard governed the trial court's review of the board's factual findings, thereby permitting it to consider all of the record evidence and to make its own findings and credibility determinations. As the relevant Practice Book provisions make clear, the motion to correct permits an appealing party to make specific challenges to the board's factual findings, and the board's decision on the motion thereafter is reviewable by the court pursuant to the standard articulated in Practice Book § 22-9 (b). The court may order the requested corrections if it concludes that that standard has been met, but otherwise must defer to the factual findings of the board pursuant to the general standard of review governing administrative agency decisions.

[3] See generally Office of Legislative Research, Report No. 2013-R-0027, "Unemployment Insurance Questions," (2013) p. 3 (comparing common-law and ABC tests for employment and explaining that, "[w]hile part A of the [ABC] test essentially codifies the common law test, parts B and C create additional requirements"), available at http://www.cga.ct.gov/2013/rpt/2013-R-0027.htm (last visited March 1, 2016).

[4] The plaintiff also performs monitoring of security systems.

[5] There is ample record support for the board's findings. Printouts from the plaintiff's website and its yellow page advertisements were in evidence in the administrative proceedings, and Cohen confirmed that the website advertised fully installed oil tanks, furnaces, air conditioning systems and security systems. Cohen explicitly and repeatedly agreed that selling, installing and servicing of heating, air conditioning and security systems were parts of the plaintiff's "product mix" and normal course of business. He estimated that the plaintiff performed $5 million worth of equipment installations annually. Cohen testified additionally that the plaintiff had fifty service technicians on its payroll, and that part of their work was the same type of work that the contract technicians performed.

[6] The plaintiff's claim that the usual course of business prong is satisfied as to the installers because it does not have any employees on payroll that perform installation services is not supported by the governing law, which directs us to look at the services that *an enterprise itself* offers to the public and performs, and not merely to the activities of those individuals whom that enterprise already concedes to be its employees. Adopting the rationale suggested by the plaintiff would enable an enterprise to contract out the entirety of its workforce, and then claim that none of the contract workers were its employees because there is nobody on payroll who is performing the same tasks. The infirmity of such a proposed rule is apparent.

[7] But see *Commissioner of the Division of Unemployment Assistance* v. *Town Taxi of Cape Cod, Inc.*, 68 Mass. App. 426, 430–31, 862 N.E.2d 430 (2007) (taxicab routes were not places of business of taxicab company); see also *Athol Daily News* v. *Board of Review of the Division of Employment & Training*, supra, 439 Mass. 179 (delivery routes were not places of business of newspaper).

[8] But see *Carpet Remnant Warehouse, Inc.* v. *Dept. of Labor*, 125 N.J. 567, 592, 593 A.2d 1177 (1991) (customer homes where carpets installed were not places of business of carpet company).

[9] But see *Sinclair Builders, Inc.* v. *Unemployment Ins. Commission*, 73 A.3d 1061, 1072–73 (Me. 2013) (jobsites were not places of business of general construction company); *Burns* v. *Labor & Industrial Relations Commission*, Docket No. WC 44749, 1992 WL 59736, *3 (Mo. App. 1992) (jobsites were not places of business of roofing company); *Metro Renovation, Inc.* v. *State*, 249 Neb. 337, 347, 543 N.W.2d 715 (1996) (jobsites were not places of business of remodeling and renovation contractor), overruled on other grounds by *State* v. *Nelson*, 274 Neb. 304, 310, 739 N.W.2d 199 (2007); *Barney* v. *Dept. of Employment Security*, 681 P.2d 1273, 1275 (Utah 1984) (jobsites were not places of business of drywall contractor).

The part B analyses in these construction cases are abbreviated and appear

to be driven, to some degree, by the reviewing courts' own sensibilities, particularly a concern that the common practice of subcontracting in the construction industry would be disrupted by a holding that a contractor's places of business include jobsites. The scope of coverage of unemployment compensation statutes, however, is a matter for legislative determination. Notably, Connecticut's detailed provisions specifically include, or exempt, a number of particular types of workers. See General Statutes § 31-222 (a) (1) and (5). If the administrator, the board or a reviewing court were to apply the ABC test too broadly, in the legislature's view, it easily could respond by enacting an overriding exemption.

[10] Notably, neither § 31-222 (a) (1) (B) (ii) (II) nor § 31-223 (a) provide that a putative employer may be exempted from making contributions pursuant to the act when the workers at issue provide services outside of, for example, "the enterprise's offices or other facilities," or "premises owned or leased by the enterprise," as they easily could have done. Instead, both statutes used broader language that appears to encompass other locations in addition to the employer's own offices, facilities or premises.

[11] I disagree with the suggestions of the majority that I rely inordinately on the remedial nature of the act, that the jurisprudential instruction to construe remedial statutory provisions in favor of their beneficiaries is, in essence, an overbroad platitude, and that the result I reach is contrary to the intent of the legislature. In short, the meaning of § 31-222 (a) (1) (B) (ii) (II) is far from clear from the text of the statute, and my consideration of the remedial nature of the act, in conjunction with numerous cases from other jurisdictions construing the very language at issue, is entirely appropriate. Additionally, as we noted previously herein, our legislature expressly has mandated that the act "be construed, interpreted and administered in such manner as to presume coverage, eligibility and nondisqualification in doubtful cases." General Statutes § 31-274 (c).

[12] The majority speculates that interpreting " 'places of business' " to include, in appropriate cases, customer homes could result in multiple entities being taxed for the services of the same worker(s). Notably, there is no claim in this case that any of the installers or technicians at issue made contributions to the fund in connection with their activities at the homes of the plaintiff's customers, nor is there any indication that the administrator has attempted to enforce the act in such a fashion.

———————————————